Rubina HUSAIN, individually and as personal representative of the estate of; Abid M. Hanson, M.D.; Hannah Husain; Sarah Husain; Isaac Husain, by and through their Guardian ad Litem, Rubina Husain, Plaintiffs–Appellees,

v.

OLYMPIC AIRWAYS, Defendant–Appellant.

No. 00–14509.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed Dec. 12, 2002.

Susie Injijian, Sterns and Walker, Oakland, CA, for the plaintiff-appellee.

Andrew J. Harakas, Condon and Forsyth, New York, NY, for the defendant-appellant.

Before REINHARDT and FISHER, Circuit Judges, and MOLLOY, District Judge.*

## OPINION

MOLLOY, District Judge:

### I. Introduction

After a non-jury trial, the district court determined that Dr. Abid M. Hanson's death on Olympic Airways ("Olympic") Flight 417 was caused by an accident as defined by Article 17 of the Warsaw Convention. The trial judge also found the accident resulted from willful misconduct by Olympic's employees. The district court awarded $1,400,000 in damages. Olympic appeals the determinations of the district court and the award of damages. We hold that the district court's findings are not clearly erroneous and we AFFIRM.

### II. Factual and Procedural Background

#### A. Overview

On January 4, 1998, 52 year-old Dr. Abid M. Hanson died while a passenger on Olympic Flight 417 between Athens, Greece and New York City. His death occurred after he suffered complications when he was exposed to ambient second-hand smoke while seated in the airplane's non-smoking section three rows in front of the smoking section. The plane had clearly demarcated sections for seating, one for smokers and one for non-smokers, though

* The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

no partition separated the two. Dr. Hanson's wife, Rubina Husain, had asked Olympic's employees on multiple occasions with increasing urgency to move Dr. Hanson to another seat away from the smoking section. She explained the critical reasons Dr. Hanson had to move and made her concerns known about the consequences of leaving him exposed to the offensive smoke. Ms. Husain's requests were ignored, primarily by flight attendant Maria Leptourgou. Dr. Hanson died from a severe asthma attack caused by the smoke exposure.

Plaintiffs filed suit in California Superior Court for Alameda County on December 24, 1998. Olympic removed the action to the United States District Court for the Northern District of California on March 23, 1999. On February 25, 2000, Olympic moved for summary judgment claiming Dr. Hanson's death was not caused by an accident as defined by Article 17 of the Warsaw Convention.[1] The district court denied the motion for summary judgment without a written opinion on March 24, 2000. A three-day bench trial was held May 30 through June 1, 2000. After the parties presented evidence, the district court asked for post-trial briefs and agreed to hear closing arguments on July 20, 2000. Findings of fact and conclusions of law were entered on August 8, 2000 finding Ms. Leptourgou's failure to move Dr. Hanson to a new seat was an accident under Article 17 of the Warsaw Convention and proximately caused his death. The trial judge found Ms. Leptourgou's refusal to help Dr. Hanson constituted willful misconduct under Article 25 of the Warsaw Convention.

The district court awarded Plaintiffs $1,400,000, but reduced the award by 50% due to Dr. Hanson's comparative negligence. On October 2, 2000, the district court issued amended findings of fact and conclusions of law. Supplemental findings of fact and conclusions of law were issued on November 28, 2000 awarding Plaintiffs an additional $700,000 in non-pecuniary damages. Final judgment was entered on November 28, 2000. Olympic timely appealed.

## B. Facts as Determined by the District Court[2]

For more than 20 years before his death on January 4, 1998, Dr. Hanson had been sensitive to secondhand smoke and tried to avoid smoke-filled areas. He suffered from asthma for which he did not receive regular treatment. However, he regularly carried and used a Proventil/Albuterol inhaler to aid his breathing. The frequency of Dr. Hanson's use of the inhaler increased as he aged.

Dr. Hanson was also allergic to many foods, including grapes, yeast and tomatoes. The extent of his allergies is unclear; however, Dr. Hanson often ate tomato-based foods without suffering a reaction.

Before his death, Dr. Hanson had suffered two medical emergencies that may have been caused by asthma or food allergies. In December 1996, Dr. Hanson and his wife were at a smoky restaurant in Las Vegas, Nevada for approximately ten minutes. Before returning to their hotel room, Dr. Hanson and his wife shared a piece of quiche and some cheese pizza. Shortly after returning to the hotel room,

1. The full name of the Warsaw Convention is the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* note following 49 U.S.C. § 40105 [hereinafter Warsaw Convention].

2. *See Husain v. Olympic Airways*, 116 F.Supp.2d 1121 (N.D.Cal.2000).

Dr. Hanson began having breathing difficulties, to the extent that Ms. Husain called paramedics and had to perform CPR. The paramedics gave Dr. Hanson a shot of epinepherine and transported him to the hospital where he remained overnight.

The cause of the Las Vegas attack is unclear. However, at trial, experts for both parties agreed that the episode was likely caused by food-related allergies. Following the Las Vegas attack, Dr. Hanson began carrying an emergency kit containing epinepherine.

During the summer of 1997, Dr. Hanson suffered another attack after dining at the home of friends in California. After he returned from a post-dinner walk, Ms. Husain noticed Dr. Hanson was having a difficult time breathing and called paramedics. The paramedics gave Dr. Hanson oxygen and observed him for a short period of time. Dr. Hanson was not taken to the hospital, nor was any epinepherine administered. The cause of the breathing difficulties is unknown.

In December 1997, Dr. Hanson, Ms. Husain and their family flew from San Francisco to Athens and Cairo for vacation. The trip involved a stop in New York. Dr. Hanson learned for the first time at the airport in New York that Olympic allowed smoking on international flights. Dr. Hanson and his family asked to be seated in the non-smoking section and their request was honored. On the flights to Athens and Cairo, the family was seated in non-smoking seats away from the smoking section and were not exposed to ambient smoke. Dr. Hanson did not suffer from breathing problems during the trip.

On January 4, 1998, Dr. Hanson and his family began the return trip from Cairo to the United State via Athens. The family arrived at the Cairo airport early to ensure they obtained non-smoking seats. Ms. Husain showed the check-in agent a letter from Dr. Hanson's brother, who was also a doctor, indicating that Dr. Hanson had asthma. The family was seated in the non-smoking section on the flight from Cairo to Athens and Dr. Hanson did not experience any breathing problems.

During a three to four hour layover in Athens, Dr. Hanson began having problems breathing. The waiting area was very smoky and Dr. Hanson was forced to use his inhaler. An attempt to move to the slightly less smoky first-class lounge was thwarted by airport officials.

Upon boarding Olympic Airways Flight 417 from Athens to New York, Dr. Hanson and his family discovered that they were seated in non-smoking seats, but only three rows ahead of the smoking section which was not partitioned off.[3] Immediately after finding their seats, Ms. Husain approached flight attendant Maria Leptourgou, informed her that Dr. Hanson could not be near the smoking section, and asked Ms. Leptourgou to move him. Ms. Leptourgou responded by telling Ms. Husain to "have a seat." [4]

---

**3.** The airplane was a Boeing 747 with 426 seats in 56 rows. Rows one through 13 were business class seats, while rows 14 through 56 were economy class. In economy class, rows 14 through 50 were non-smoking seats and the seats in rows 51 through 56 were in the smoking section. Dr. Hanson was seated in row 48, seat E.

**4.** Ms. Leptourgou was not available for the trial and had not been deposed. The district court noted that its factual findings regarding Ms. Leptourgou were based primarily on Ms. Husain's testimony, which the district judge found "quite credible." *Husain,* 116 F.Supp.2d at 1125 n. 2. The district court also noted that Ms. Husain's testimony was corroborated by the testimony of the Sabharwals, friends of Dr. Hanson and his family who accompanied them on the trip, and Issac and Sarah Husain, and "much of the uncontradicted evidence." *Id.*

After all of the passengers were seated, but before take-off, Ms. Husain once again approached Ms. Leptourgou and adamantly asked that she move Dr. Hanson to another seat, explaining that he was allergic to smoke. Ms. Leptourgou refused, stating that she was "too busy" and the flight was "totally full." *Husain,* 116 F.Supp.2d at 1125.

Immediately after take-off, passengers in the smoking section were allowed to begin smoking. From that point forward, people in the smoking section were smoking continuously, including people seated in rows 51 through 56 and people in other rows who moved back to the smoking section to smoke and socialize. The smoke began to envelope Dr. Hanson and his family. After Dr. Hanson indicated that the smoke was bothering him, Ms. Husain approached Ms. Leptourgou and, for the third time on the airplane, told her that she needed to move Dr. Hanson for health reasons. Ms. Leptourgou again refused stating that the plane was full. She did tell Ms. Husain that she and Dr. Hanson could ask other passengers to switch seats, but they would not be assisted by the flight crew. Despite one last plea for help by Ms. Husain, Ms. Leptourgou refused to help Dr. Hanson find another seat.[5]

The amount of smoke floating around row 48 only increased as the flight progressed, especially after a meal was served. While Dr. Hanson ordered a meal, he did not eat much, and shared his meal with his daughter and another passenger. After the meal, Dr. Hanson's breathing problems worsened. He had emptied one inhaler and asked Ms. Husain to get another one. After telling his daughter that the smoke was bothering him, he walked to the front of the cabin to get some fresh air.

Ms. Husain followed Dr. Hanson to an area between rows 19 and 20 where he had stopped and was leaning against a chair. The doctor asked for his epinepherine kit, which Ms. Husain retrieved and then administered a shot. She then went to notify Dr. Umesh Sabharwal, an allergist and family friend who was traveling with Dr. Hanson and his family.

Dr. Sabharwal helped Dr. Hanson to the floor, administered another shot of epinepherine, and then began performing CPR. Dr. Hanson's pulse was barely detectable and his lower airway was obstructed, though the upper airway was not. Dr. Sabharwal continued to perform CPR and also administered a shot of Bricanyl. Dr. Hanson was also given oxygen during this time.[6] Despite the efforts of Dr. Sabharwal and other passengers who assisted, Dr. Hanson died.

Because of religious reasons, there was no autopsy to determine the direct cause of death. In the district court and here, Plaintiffs argued that Dr. Hanson died from a severe asthma attack caused by inhaling secondhand smoke. Defendants believe that Dr. Hanson's death was the result of an allergic reaction to food or some other medical problem unrelated to the smoke. The district court determined

---

**5.** Despite Leptougou's statements otherwise, Flight 417 was not full. The flight had 11 unoccupied seats, two of which were in business class. The flight was also carrying 28 non-revenue passengers, including employees and relatives of employees of Olympic and other airlines, 17 of whom were seated in business class or in the non-smoking section. *Husain,* 116 F.Supp.2d at 1126.

**6.** The district court found the testimony regarding who supplied and administered the oxygen was "entirely contradictory." *Husain,* 116 F.Supp.2d at 1127 n. 7. Some witnesses testified that the oxygen was supplied from a canister and mask belonging to Olympic, while others testified the oxygen came from a canister and mask from Dr. Hanson's emergency kit.

that the smoke exposure during Flight 417 was the primary cause of Dr. Hanson's death. We abide by and defer to those findings.

Of major significance to the district court was the timing of the events. First, Dr. Hanson was complaining about the secondhand smoke before the meal was served. Second, while Dr. Hanson had some food allergies and he did eat some food on the flight, there was no evidence that he ate any foods to which he was allergic. Third, experts for both parties and Dr. Sabharwal testified that smoke was a contributing factor, though the degree to which it contributed was disputed. Nonetheless, it is for the district court to resolve the factual disputes and to draw inferences from the proof.

## III. Analysis

### A. Standard of Review

■■■ A district court's findings of fact are reviewed for clear error. *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir.2001). Clear error review is deferential to the district court, requiring a "definite and firm conviction that a mistake has been made." *See Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). Thus, if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently. *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir.2000)(en banc).

■■■ A district court's conclusions of law are reviewed de novo. *Freeman*, 253 F.3d at 536. However, if the application of the law to the facts requires an inquiry that is "essentially factual," review is for clear error. *Koirala v. Thai Airways Int'l, Ltd.*, 126 F.3d 1205, 1210 (9th Cir. 1997). A district court's determination of proximate cause is reviewed for clear error. *Tahoe–Sierra Pres. Council, Inc. v.*

*Tahoe Reg. Planning Agency*, 216 F.3d 764, 783 (9th Cir.2000), *aff'd*, 535 U.S. 302, 122 S.Ct. 1465 (2002). Likewise, a district court's finding of "willful misconduct" under Article 25 of the Warsaw Convention is reviewed for clear error. *Koirala*, 126 F.3d at 1210.

### B. Dr. Hanson's Death Was Proximately Caused by an "Accident" Under Article 17 of the Warsaw Convention

#### (1) Article 17 "accident"

■■■ Liability for harm to international air travelers is established by Article 17 of the Warsaw Convention. Article 17 provides, in its entirety:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Warsaw Convention, art. 17. For a carrier to be liable to an injured passenger, the passenger must prove an accident caused the injury. *Air France v. Saks*, 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). As defined by the Supreme Court, an accident is "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405, 105 S.Ct. 1338.

■■■ When determining whether an accident has occurred, the definition of accident "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* Where there is contradictory evidence, "it is for the trier of fact to decide whether an 'accident' . . . caused the passenger's injury." *Id.* If the passenger's injury "indisputably results from the passenger's own

internal reaction to the usual, normal, and expected operation of the aircraft," it is not the result of an accident as envisioned under Article 17. *Id.* at 406, 105 S.Ct. 1338.

■ The district court found Ms. Leptourgou's refusal to move Dr. Hanson to another seat, despite three increasingly desperate requests by Ms. Husain, was an accident under Article 17. It did so because Ms. Leptourgou (1) violated the recognized standard of care for flight attendants on international flights by refusing to assist; (2) violated Olympic's policy; and (3) failed to alert the chief cabin attendant or another flight attendant to help Dr. Hanson find another seat. The district court found that Ms. Husain specifically told Olympic workers, including Ms. Leptourgou, that Dr. Hanson was "susceptible to smoke," "allergic to smoke," and "could not be in any smoke." Despite these warnings, Ms. Leptourgou refused to assist Dr. Hanson. Considering the warnings and knowledge of the doctor's medical problems, Ms. Leptourgou's actions constituted an unusual or unexpected event. Ultimately, the district court concluded that Ms. Leptourgou's actions created a foreseeable risk of injury and therefore constituted an accident under Article 17.

Olympic argues Dr. Hanson's death resulted from "internal reactions to the usual, normal, and expected operation of the aircraft" and therefore cannot have resulted from an accident. A predicate of the argument is that the presence of ambient smoke in the cabin is "an expected and normal aspect of international air travel." Consequently, Olympic argues it had no duty to move Dr. Hanson. Olympic further contends that Dr. Hanson's pre-existing allergies, not his exposure to ambient secondhand smoke, led to his death.

Plaintiffs in essence contend that a flight attendant who does nothing to deal with a known risk to a passenger's health-related travel problems is negligent. Because Ms. Leptourgou's conduct was negligent, it fits the definition of accident under Article 17. Plaintiffs argue that crew negligence is external to the passenger and is not a reasonably expected part of international travel.

In *Abramson v. Japan Airlines Co.*, plaintiff Stanley Abramson suffered from a pre-existing paraesophagel hiatal hernia for which he had been undergoing treatment for six years. 739 F.2d 130, 131 (3d Cir.1984). Abramson had been hospitalized for the condition in June 1981 and had been informed that he should have elective surgery to alleviate the condition. *Id.*

In August 1982, Abramson's condition began to bother him while on a Japan Airlines flight. *Id.* Abramson had not informed Japan Airlines of his condition. When Abramson's wife asked that he be able to lie down across multiple seats to apply a self-help remedy to relieve the pain, a flight attendant told her there were no empty seats. *Id.* It was later determined through discovery in the case that nine first class seats were open. *Id.*

Abramson alleged that the flight attendant's refusal to allow him to lie down caused his condition to worsen, ultimately leading to his hospitalization. The district court entered summary judgment in favor of Japan Airlines finding that Abramson's injuries were not the result of an accident. *Id.* The Third Circuit affirmed the district court, finding that an aggravation of an existing injury during a routine flight, absent "proof of abnormal external factors," was not an unusual or unexpected event. *Id.* at 133.

In *Krys v. Lufthansa German Airlines*, plaintiff Leonard Krys began feeling ill during the first few hours of a ten-hour Lufthansa German Airlines ("Lufthansa") flight between Miami, Florida and Frankfurt, Germany. 119 F.3d 1515, 1517 (11th Cir.1997). A doctor on board was sum-

moned by flight attendants to tend to Krys. The crew did not make an unscheduled landing, instead relying on the doctor's opinion that Krys was okay. While the plane was flying over Amsterdam, the doctor determined that Krys had likely had a heart attack. After landing in Germany, Krys was taken to a hospital where doctors confirmed that he had suffered a heart attack. *Id.*

Krys filed suit alleging that the crew acted negligently when it failed to properly respond to his symptoms, and that those negligent acts aggravated his injuries. *Id.* The Eleventh Circuit affirmed a district court judgment in Krys' favor, finding that the plane continuing to its intended destination—the "aggravating event" leading to Krys' injury—was not an unexpected or unusual event and therefore not an accident under Article 17. *Id.* at 1521–22. Ironically, the airline—in an effort to invoke the Warsaw Convention's liability limit—was urging the Eleventh Circuit to find that Krys' injuries were the result of an accident, while Krys argued that his heart attack was *not* caused by "an unexpected or unusual event external to the passenger." *Id.* at 1518–20.

The situations in *Krys* and *Abramson* are factually different from Dr. Hanson's case. In Krys, Lufthansa employees relied upon the advice of a doctor who had been summoned from among the passengers and made the initial, albeit erroneous, determination that Krys had not suffered a heart attack. Thus, Lufthansa was not aware that there was a need for immediate action. Likewise, in Abramson, defendant Japan Airlines was not informed that Abramson had a medical condition that required such action. Nothing in Abramson's case indicates that he made multiple requests or informed the crew of the urgency of the situation. By contrast, Ms. Husain repeatedly informed Ms. Leptourgou and other Olympic personnel that Dr.

Hanson could not be exposed to smoke for health reasons, and that it was necessary that he be moved immediately. Despite her knowledge of Dr. Hanson's health risk, Ms. Leptourgou failed to act.

■ The district court found, after examining evidence establishing industry standards and Olympic's policies regarding passengers with medical needs, that this failure to act was a "blatant disregard of industry standards and airline policies." *Husain,* 116 F.Supp.2d at 1134. Ms. Leptourgou's failure to act was more egregious in light of the simple nature of Ms. Husain's request, which could easily have been satisfied without interference with the airplane's normal operation. Combined, these factors bring Ms. Leptourgou's failure to assist Dr. Hanson within the meaning of an "accident" for Article 17 purposes. Her conduct was clearly external to Dr. Hanson, and it was unexpected and unusual in light of industry standards, Olympic policy, and the simple nature of Dr. Hanson's requested accommodation. The failure to act in the face of a known, serious risk satisfies the meaning of "accident" within Article 17 so long as reasonable alternatives exist that would substantially minimize the risk and implementing these alternatives would not unreasonably interfere with the normal, expected operation of the airplane.

Because the district court's conclusion that Ms. Leptourgou's failure to help Dr. Hanson constituted an unexpected or unusual event is inextricably intertwined with the facts in this case, it is reviewed for clear error. *See Koirala,* 126 F.3d at 1210. Based on the record before the district court, we cannot conclude that it clearly erred.

**(2) Accident as proximate cause of Dr. Hanson's death**

For a carrier to be liable to a passenger for an injury, the passenger must prove

the accident caused the injury. *Saks,* 470 U.S. at 396, 105 S.Ct. 1338. "Any injury is the product of a chain of causes" and the passenger need only prove "some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 406, 105 S.Ct. 1338.

■ Olympic argues that Dr. Hanson's death resulted from his pre-existing food allergies, noting that the meal served on Flight 417 included numerous food items to which Dr. Hanson was allergic. Pointing to past incidents where Dr. Hanson suffered medical problems ostensibly after eating foods to which he was allergic, Olympic further asserts the exact cause of Dr. Hanson's death is unknown because food-related anaphylaxis cannot be ruled out and there was no evidence presented to show asthma caused his death. Finally, Olympic asserts there was no evidence Dr. Hanson would have lived had Olympic found him a different seat.

Plaintiffs counter that the evidence showed secondhand smoke around Dr. Hanson's seat was heavy, especially after mealtime, and that there was no evidence showing anaphylaxis caused Dr. Hanson's death. Plaintiffs also assert that secondhand smoke need not be the sole cause of Dr. Hanson's death, as long as it is a cause.

In its findings of fact, the district court rejected the assertion that Dr. Hanson died as a result of food-related anaphylaxis. Rather, the district court found Dr. Hanson's died as a result of exposure to secondhand smoke. The district court stated:

> The Court cannot credit defendant's suggestion that Dr. Hanson's breathing problems prior to the meal were causally unrelated to his later asphyxiation. The evidence before the Court suggests exactly the opposite conclusion. Dr. Hanson explicitly complained that smoke was affecting his breathing just hours

before his death, complained to his wife about the level of cigarette smoke on the plane, and relied extensively on his inhaler for support during the hours leading to his fatal attack. To conclude, as defendant urges, that the smoke on Flight 417 did not trigger Dr. Hanson's death is to ignore the chain of events leading up to his attack.

*Husain,* 116 F.Supp.2d at 1128–29. Further, the district court considered Dr. Hanson's previous reactions to food and the food served on the plane, yet found Dr. Hanson was suffering breathing difficulties before the meal on the airplane was served and that there was not any testimony that Dr. Hanson ate any of the foods he was allergic to while on Flight 417.

As discussed above, it is apparent that the failure to move Dr. Hanson caused exposure to the smoke that led to his death. There was testimony at trial that the smoke around Dr. Hanson was particularly thick. Olympic personnel were aware of Dr. Hanson's condition, yet they did nothing to assist him. Under *Saks,* the accident need not be the sole cause of the injury, but it must be a "link in the chain." 470 U.S. at 406, 105 S.Ct. 1338. In this case, the exposure to smoke and failure to move Dr. Hanson is such a link. The facts as determined by the district court, and confirmed by the record, establish that seats were available and that Ms. Leptourgou's failure to help Dr. Hanson resulted in continued exposure to second hand smoke. The district court concluded that had Ms. Leptourgou heeded Ms. Husain's requests for help, Dr. Hanson would not have been exposed to second hand smoke and would not have died. In other words, the minimization of the risk of smoke exposure would have prevented the physiological response that caused his death.

Whether Dr. Hanson's death was caused by a reaction to second hand smoke resulting from Ms. Leptourgou's failure to assist or by a reaction to food allergies may appear to be a close call. However, the district court, as the trier of fact, was in the best position to determine which of two plausible explanations was correct. The district court's determination here is plausible in light of the record before the district court, thus is not clearly erroneous, and will not be disturbed on appeal.

## C. Dr. Hanson's Death Was Proximately Caused by Olympic's "Willful Misconduct" Under Article 25 of the Warsaw Convention

Carrier liability for injuries caused by an accident is usually limited to $75,000 per passenger. However, Article 25 provides that injuries that result from the carrier's willful misconduct or the willful misconduct of an employee acting within the scope of her employment are excluded from the liability limits.[7] Warsaw Convention, art. 25. Article 25 does not create a separate cause of action and therefore a plaintiff must establish both an accident and willful misconduct to be able to recover above the $75,000 limit. *McDowell v. Cont'l Airlines*, 54 F.Supp.2d 1313, 1321 (S.D.Fla.1999).

Willful misconduct has been defined as "the intentional performance of an act with knowledge that the ... act will probably result in injury or damage or the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences."[8] *Koirala*, 126 F.3d at 1209 (quoting *Johnson v. Am. Airlines, Inc.*, 834 F.2d 721, 724 (9th Cir. 1987)). At a minimum, a plaintiff must prove the carrier "must have known" of the risk to prove willful misconduct. *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1291 (11th Cir.1999). Determining willful misconduct is based on a subjective standard and can be satisfied through circumstantial evidence. *Koirala*, 126 F.3d at 1211.

In *Koirala*, a plane crashed into a mountain after the crew flew in the wrong direction for six minutes while attempting to land in Kathmandu. *Id.* at 1208. Thai Airways argued that the evidence showed the crew was stressed because of poor weather and difficult landing conditions and that the evidence did not show the crew consciously failed to look at their instruments. *Id.* at 1210. This Court found the district court did not clearly err in finding willful misconduct given the crew's failure to realize the plane was flying in the wrong direction for six minutes.

**7.** Montreal Protocol No. 4 later amended the Warsaw Convention's "willful misconduct" standard to one of "intentionally or recklessly with knowledge that damage would probably result." The United States Senate ratified the Protocol in November 1998 and it went into force in the United States on March 4, 1999. *Carey v. United Airlines*, 255 F.3d 1044, 1047 n. 11 (9th Cir.2001) (citations and internal quotations omitted).

**8.** This Court has also analyzed Article 25's "willful misconduct" standard under California law. *See Dazo v. Globe Sec. Servs.*, 295 F.3d 934, 940–41 (9th Cir.2002) (cargo case). Under California law, willful misconduct is distinguishable from negligence:

Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it involves a more positive intent actually to harm another or to do an act with a positive, active, and absolute disregard of its consequences.

*Id.* at 941 (*citing Calvillo–Silva v. Home Grocery*, 19 Cal.4th 714, 80 Cal.Rptr.2d 506, 968 P.2d 65, 76 (1998) (citations and internal quotations omitted)). Ms. Leptourgou's failure to act constituted willful misconduct under either of these standards.

*Id.* In reaching its conclusion, this Court paid particular attention to expert testimony offered by the plaintiffs to establish the standard of care. *Id.* at 1211.

■ Like the crew in *Koirala,* Ms. Leptourgou's failure to take action, either by moving Dr. Hanson or by notifying the chief cabin attendant of Ms. Husain's request to have her husband moved, was willful misconduct. The district court concluded "Ms. Leptourgou *must have known* that the cabin was not full, that Dr. Hanson had a medical problem and a special susceptibility to smoke, and that her failure to move him would aggravate his condition and cause him probable injury." *Husain,* 116 F.Supp.2d at 1139. This conclusion is supported by the record in this case, including the highly credible testimony of Ms. Husain. Additionally, because Ms. Leptourgou did not testify in person or by deposition, Ms. Husain's version of events was uncontradicted.

Of equal import was testimony by Plaintiffs' expert that Ms. Leptourgou was aware of the industry standard of care and Olympic policy regarding passengers requesting seat transfers for medical reasons. This established that Ms. Leptourgou should have assisted Dr. Hanson in finding a new seat, especially since there were available seats further away from the smoking section. Ms. Leptourgou's duty to act was compounded by the urgency of Ms. Husain's requests.

Olympic argues that Plaintiffs did not show Ms. Leptourgou engaged in misconduct or that she was subjectively aware of the risk of harm to Dr. Hanson. In Olympic's view, all of the seats in Ms. Leptourgou's section were full so she was not aware the flight was not totally full, and she was not aware of the risk of harm to Dr. Hanson because he did not ask to be moved, nor did he or Ms. Husain seek a different seat when Ms. Leptourgou told them they could. Even so, she still did not advise the crew chief of the problem.

However, as the district court determined, Ms. Husain "was not merely a typical passenger complaining about an inconvenient seat assignment," because her repeated requests became increasingly "emphatic and desperate." *Id.* Based on Ms. Husain's testimony, the district court found Ms. Leptourgou could not have "failed to recognize that Dr. Hanson's problem was a medical one and that sitting near the smoking section was likely to cause him injury." *Id.* Despite this, Ms. Leptourgou "deliberately closed her eyes to the probable consequences of her acts." *Id.*

The district court, as the trier of fact in this matter, was in a superior position to appraise and weigh the evidence, and its determination regarding the credibility of witnesses is entitled to special deference. *See Anderson v. City of Bessemer,* 470 U.S. 564, 573–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Allen v. Iranon,* 283 F.3d 1070, 1078 n. 8 (9th Cir.2002). The district court's decision was based on the testimony of Ms. Husain, Plaintiffs' expert, and Olympic's own employees, and is well-grounded in the record. While establishment of willful misconduct requires a party to satisfy a high burden, the evidence before the district court in this case is sufficient to meet that burden. The facts in the record establish that Ms. Leptourgou was aware that Dr. Hanson was in a desperate situation that required immediate assistance, yet despite this knowledge and increasingly emphatic pleas from Ms. Husain, Ms. Leptourgou ignored Olympic's policy and industry standards and refused to assist Dr. Hanson. This amounts to a dereliction of duty that is not only unusual and unexpected on an international flight, but willful.

The district court's conclusion that Ms. Leptourgou's actions were willful misconduct cannot be disturbed on review unless we are left with a "definite and firm conviction that a mistake has been made." *Sec. Farms v. Int'l Bhd. of Teamsters*, 124 F.3d 999, 1014 (9th Cir.1997). Based on facts in the record and the exhaustive findings by the district court, we cannot conclude that a mistake has been made.

## IV. Conclusion

We decide that the district court's findings and conclusions are well-grounded in the record. Olympic's argument asks this Court to substitute its judgment and second guess the district court. This we cannot do. Olympic failed to meet its burden of showing that the district court's findings are clearly erroneous and that the district court erred in its application of the law. Therefore, we affirm the judgment of the district court.

**AFFIRMED.**