**ANTHONY SARDINA, Appellant,**

**v.**

**F/V KASSANDRA Z, OFFICIAL NO. 653390, et. al., HER ENGINES, NETS, FURNITURE, etc.,** *in rem,* **KASSANDRA Z FISHING COMPANY, INC., a Commonwealth of the Northern Mariana Islands Corporation,** *in personam,* **Appellees.**

High Court of American Samoa
Appellate Division

AP No. 01-02

July 27, 2004

Before RICHMOND, Associate Justice, GOODWIN,[*] Acting Associate Justice, TASHIMA,[**] Acting Associate Justice, LOGOAI, Chief Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Appellant, Roy J.D. Hall, Jr., and Thomas G. Gilmore, *pro hac vice*
For Appellees, Mark F. Ude, and Michael A. Barcott, *pro hac vice*

---

[*] Honorable Alfred T. Goodwin, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of the Interior.
[**] Honorable A. Wallace Tashima, Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of the Interior.

## OPINION

While traversing the deck of the Kassandra Z, a 1200-ton tuna seiner deployed in the western Pacific Ocean, Anthony Sardina lost his footing and fell near the galley. As a result of the fall, Sardina suffered severe spine and head injuries. He brought suit against the Kassandra Z, her owner, and TCW Special Credits, to recover for his injuries. The Trial Division awarded Sardina over $300,000.00 in damages and attorneys' fees. Sardina appeals, challenging the court's findings as to his lost future earnings and work life expectancy, its calculation of his attorneys' fees, its finding of contributory negligence, its award of general damages for pain and suffering, and its failure to award prejudgment interest. We have jurisdiction to review the final decision of the Trial Division pursuant to A.S.C.A. § 3.0208(c). We affirm on all issues, except with respect to prejudgment interest.

### Background

The slip-and-fall which gave rise to this appeal was the result of, among other factors, a poorly maintained freezer near the galley of the Kassandra Z. The freezer had a deteriorated rubber gasket, which caused below-freezing air to escape and collide with the humid equatorial air outside. The mixture of hot and cold air condensed as water on the stainless steel door of the freezer, which streamed down the door and formed a puddle on the Kassandra Z's deck. Grease from the adjacent galley mixed into the water, further increasing the puddle's viscosity and its danger to the crew. To make matters worse, the portion of the deck upon which the puddle had formed lacked non-skid strips, which had been installed on other parts of the deck to prevent slipping in wet conditions. Six of the Kassandra Z's crew members had slipped in the same area prior to Sardina's fall.

These were the conditions on deck at 6:30 p.m. on January 17, 1996, when Sardina, who was the licensed Master and Navigator of the Kassandra Z, headed from his living quarters to the ship's laundry room to retrieve his clothes. As Sardina stepped into the puddle in front of the galley, his front foot shot forward and he fell backward. Sardina landed on his back, slammed his head on the deck, and lost consciousness. When he awoke he was dizzy, in excruciating pain, and covered with water. At the time of the fall, Sardina was wearing flip-flops.

Sardina disembarked at the nearest port to seek medical treatment. A physician examined and X-rayed Sardina, diagnosed him with a compressed disc in his lower back, and recommended that he seek further attention. Sardina was sent home to San Diego, California, where he was treated by Dr. Laufenberg, a physician to whom he was referred by the

Kassandra Z's insurance company. Over the course of four visits between February and April 1996, Dr. Laufenberg diagnosed Sardina with a contused scalp, a concussion, post-concussion syndrome (a condition that affects mental processing), cervical and lumbar sprains, herniated discs in his lower back, and tarsal tunnel syndrome, a condition that causes numbness and pain in the feet. Sardina also saw a podiatrist and specialists in pain management and memory problems. Sardina's pain and memory problems persisted for over a year, during which he suffered from depression and weight gain. In June 1997, Sardina's physician recommended surgery to cure the degeneration of his spinal discs, but neither the Kassandra Z's owner nor her insurer would authorize the funds necessary to pay for the operation.

On December 7, 1999, Sardina finally had surgery to repair his degenerating spinal discs. After his surgery, Sardina's back pain gradually decreased, and by January 2000 it was gone. However, due to his injuries, Sardina can no longer do work that requires prolonged standing, continuous walking on uneven surfaces, or lifting heavy objects. He can never work on a tuna fishing boat again.

Upon her arrival in American Samoa, the Kassandra Z was seized by her mortgage holder, TCW Special Credits, and she was subsequently foreclosed on and sold to satisfy her debt. Sardina intervened in the foreclosure action and sued both the vessel and her owner to recover for his injuries. He alleged claims for negligence under the Jones Act, *see* 46 U.S.C. § 688, and "unseaworthiness" and "maintenance and cure" under the Trial Division's general maritime jurisdiction, *see* A.S.C.A. § 3.0208(a)(3). After a four-day trial, the Trial Division found for Sardina. It found that Sardina's fall was caused by two factors attributable to the Kassandra Z. The first was the greasy puddle formed by the water leaking from the deteriorating freezer door. The second was the lack of non-skid strips that might have improved Sardina's traction and prevented the fall. The third cause of the fall, the court found, was Sardina's own negligence in choosing to wear flip-flops on deck and failing to recognize and correct the dangerous condition.

After reducing his damages award by 40 percent for contributory negligence, the court awarded Sardina a total of $303,823.29 in general and special damages, damages for maintenance and cure, and attorneys' fees. On appeal, Sardina challenges the court's findings as to his lost future earnings and work life expectancy, its calculation of his attorneys' fees, its omission of prejudgment interest, its finding of contributory negligence, and its award of general damages.

16

## Jurisdiction

■ The Trial Division had jurisdiction over Sardina's maritime claims for "unseaworthiness" and "maintenance and cure" pursuant to A.S.C.A. § 3.0208(a)(3). Because Sardina brought his Jones Act claim in admiralty pursuant to T.C.R.C.P. 9(h), it also fell within the Trial Division's maritime jurisdiction. *See Doucet v. Wheless Drilling Co.,* 467 F.2d 336, 339 (5th Cir. 1972) (holding that Jones Act claims can be brought either in admiralty or at law). Alternatively, the Trial Division had jurisdiction over Sardina's Jones Act claim pursuant to 46 U.S.C. § 688. *Clifton v. Voyager, Inc.,* 29 A.S.R.2d 80, 86-87 (Trial Div. 1995). We have jurisdiction over this appeal pursuant to A.S.C.A. § 3.0208(c).

## Standard of Review

■ We review the Trial Division's determination that prejudgment interest is not available as a matter of law *de novo*. *Battista v. FDIC, 195* F.3d 1113, 1116 (9th Cir. 1999). We review its work life expectancy determination, future earnings determination, finding of contributory negligence, and award of general damages for clear error. T.C.R.C.P. 52(a); A.S.C.A. § 43.0801(b); *Kim v. Star-Kist Samoa, Inc.,* 8 A.S.R.2d 146, 151 (App. Div. 1988). We review its calculation of attorneys' fees for an abuse of discretion. *Glynn v. Roy Al Boat Mgmt. Corp.,* 57 F.3d 1495, 1501 (9th Cir. 1995).

## Discussion

### I. Work Life Expectancy

■ The Trial Division found that although Sardina had briefly performed other work, he was a career fisherman and would have continued as a Master/Navigator but for his injury. It also found that because of the physical hardship of a career in tuna fishing, Sardina would not have been able to work past the age of 52, and that due to a shrinking job market for tuna fishermen, Sardina's work life expectancy would have been reduced by an additional five years. The Trial Division's factual findings as to Sardina's work life expectancy "must not be set aside unless clearly erroneous." *See* T.C.R.C.P. 52(a). We will affirm, even if we would have found differently, so long as the trial court's findings are "plausible" in light of the record in its entirety. *See Husain v. Olympic Airways,* 316 F.3d 829, 835 (9th Cir. 2002), *aff'd,* 124 S. Ct. 1221 (2004). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574 (1985).

17

We cannot say that the Trial Division's findings as to the physical limitations on Sardina's work life expectancy were clearly erroneous. In fixing Sardina's probable retirement age, the Trial Division split the difference between the work life expectancy estimates offered by Sardina's expert Robert Wallace (62), and by the Kassandra Z's expert Dana Basney (42). Sardina contends that the figure testified to by Basney is "totally lacking in relevance" to his occupation. But the figure offered by Basney is perhaps the *most* relevant figure. It refers to a study of crab fishermen working in the Bering Sea that showed that, due to the harsh conditions associated with the job, the fishermen tended to retire before the age of 42. Wallace, on the other hand, testified only to the average retirement age of workers in the United States (60.8), and the average retirement age of fishermen as reported by the Fisherman's Union Pension Trust (62). Basney acknowledges that his study may not apply directly to tuna fishermen, whose working conditions are less difficult than those of Bering Sea crab fishermen. But it is certainly "plausible" that a tuna fisherman would retire ten years later than a Bering Sea crab fisherman, whose working conditions are more difficult, but ten years earlier than an average American worker, whose working conditions are more favorable.[1]

Nor did the Trial Division clearly err in reducing Sardina's expected retirement age by an additional five years on account of "market constraints." Evidence in the record supports the Trial Division's finding that Sardina would have been forced to retire early due to extreme competition in the tuna fishing industry, a shrinking fleet of American fishing vessels, and Sardina's lack of a sustained commitment to any particular boat. *See Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984) ("It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live *and* work a longer, or shorter, period than the average."). Captain Medina testified that due to the lack of jobs in the tuna fishing industry, his four sons were forced to retire from their positions as captains and chief engineers on tuna boats. Appellees' expert Basney noted that Sardina held 13 different jobs over a six-month period and had "a lot of spottiness" in his employment record. Indeed, during his 19 years as a fisherman, Sardina worked for 18 different vessels. Although we may

---

[1] Sardina also argues that the court erred in taking into account his "increased susceptibility to back injury" when calculating his probable retirement age because the parties stipulated that the medical report detailing his preexisting back injury would not be offered into evidence. But Sardina testified about the back injury in response to his own counsel's questioning, and defendants' expert Dr. Vance testified (without objection) about the injury at trial. Dr. Vance's testimony that "riding around and bouncing off an 8-foot wave" would aggravate Sardina's back injury amply supports the Trial Division's finding.

not have reached the same conclusion, we do not think the trial court's finding was clearly erroneous.

## II. Future Earnings

■ When calculating Sardina's future earnings, the Trial Division averaged the highest estimates proposed by Sardina's own rehabilitation consultant ($36,000), and the highest estimate proposed by Sardina's own expert witness ($60,000), and found that he would make an average of $48,000 per year for the remainder of his career. The Trial Division's finding was "plausible" based on the evidence in the record, *see Husain*, 316 F.3d at 835, and it was based on figures suggested by Sardina's own witnesses. Therefore, it was not clearly erroneous.

## III. Contributory Negligence

The Trial Division apportioned to Sardina 40 percent of the fault for the accident due to his own contributory negligence and reduced his recovery accordingly. The court reasoned that as the "safety officer" of the Kassandra Z, Sardina had a responsibility to ensure that the deck was kept in a safe condition, and his failure to recognize and remedy the conditions that caused his fall was negligent. It also faulted Sardina's choice to wear flip-flops on deck. We review the court's finding of contributory negligence for clear error. *Star-Kist*, 8 A.S.R.2d at 148-49.

### A. Failure to Recognize and Remedy the Slippery Condition

■ The Trial Division found, and Sardina does not dispute, that as the ship's Master he was ultimately responsible for the safety of its crew.[2] Sardina testified that he had frequent contact with the area of the fall, that he had observed the lack of non-skid strips in the area, and that it was not uncommon for the deck in that area to be wet. Nonetheless, he claimed that he did not consider the lack of nonskid strips to be a hazard and that he had no reason to know that the area was dangerous prior to his fall. Noting that six people had slipped in the area prior to Sardina's fall, the Trial Division found that "[e]ither Sardina's testimony is incredible, or else he acted incompetently as an officer of the ship." Neither finding is clearly erroneous. As to the finding that Sardina's testimony is

---

[2] This is the critical distinction between the facts of this case and the facts of *Star-Kist*. In *Star-Kist*, we reversed the Trial Division's finding of contributory negligence against a dockworker, holding that the Trial Division improperly imposed on the plaintiff a duty to anticipate dangerous conditions on the dock. 8 A.S.R.2d. at 149. Whereas the dockworker in *Star-Kist* had no overall duty to maintain the safety of the dock upon which he was injured, Sardina, as the ship's Master, had a general duty to maintain the safety of the Kassandra Z.

19

incredible, we have no reason to doubt the Trial Division's assessment. *See* T.C.R.C.P. 52(a) ("due regard" must be given "to the opportunity of the trial court to judge the credibility of the witnesses"). As to the finding that Sardina was simply incompetent, such a finding is supported by Captain Medina's testimony about the frequent presence of water on tuna boats and the fact that non skid strips were used to provide traction on other parts of the deck. In order to find Sardina negligent, the Trial Division did not have to find that he *knew* of the danger and failed to act; it needed only determine that he *should* have known of the danger.

 Sardina argues that the Trial Division's finding of contributory negligence is inconsistent with its ruling that he was not barred from recovery by the Primary Duty Rule. The Primary Duty Rule bars a Jones Act claimant from recovering "for injuries caused by his own failure to perform a duty imposed on him by his employment." *Bernard v. Maersk Lines, Ltd.,* 22 F.3d 903, 905 (9th Cir. 1994) (quoting *Cal. Home Brands, Inc. v. Ferreira,* 871 F.2d 830, 836 (9th Cir. 1989)). Courts have recognized a tension between the Primary Duty Rule and the rule that contributory negligence does not bar a sailor's recovery in admiralty torts, but the rules are not inconsistent. *See id.* (noting that "the important thing . . . is to distinguish between [the duty to avoid contributory negligence], which the law imposes upon the injured person, regardless of any conscious assumption of a duty towards the wrongdoer, and a duty which the injured person has consciously assumed as a term of his employment"). In order to interpret the rules consistently, courts have construed the Primary Duty Rule narrowly. Three limitations apply:

> First, the "primary duty" rule will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing violation of a duty consciously assumed as a term of employment. It does not apply to a momentary lapse of care by an otherwise careful seaman.

*Id.* at 907. This case requires us to apply the third limitation. In holding the Primary Duty Rule inapplicable, the Trial Division found that Sardina did not "knowingly violate[] his consciously assumed duty to safeguard the ship." In finding contributory negligence, on the other hand, the Trial Division held that "Sardina's *failure to notice* much less investigate and repair the slippery floor constitutes a partial failure of the official duty of an officer to insure the safety of the ship, and that his failure contributed to his mishap" (emphasis added). There is nothing inconsistent about the

Trial Division's finding that Sardina did not "knowingly" violate his duty to maintain a safe vessel, but that his failure to competently execute his duty to maintain the safety of the ship was negligent.

B. Sardina's Choice to Wear Flip-Flops

▇▇▇ The Trial Division's finding that Sardina's choice to wear flip-flops on deck was negligent and that it was partially to blame for the fall was likewise not clearly erroneous. Captain Medina, a veteran of the tuna fishing industry, testified that flip-flops are "slippery," have no heel, and provide no lateral support. He also testified that flip-flops are not safe for traversing the deck of a boat when it is wet, that it is very common for the interior deck of a tuna fishing boat to be wet, and that he never allowed flip-flops on his boat. The fact that the fall happened in a wet and slippery part of the deck, where the increased support and traction of shoes or boots may have made a difference, further supports the finding.

Sardina argues that even if flip-flops are generally unsafe in that they lack a heel and provide no lateral support, there is no evidence that Sardina's flip-flops caused the fall in his case because his foot slipped forward, the only direction in which a flip-flop does provide some support. But we are not persuaded that the danger of the flip-flop lies solely in its lack of a heel and lateral support. Captain Medina testified that flip-flops are unsuitable for walking on the deck of a fishing boat because when wearing flip-flops, "you're walking with your toes crimped up and it sort of puts a little pressure on the shoe." He also testified about the general instability of flip-flops, noting that they "could fall off as you're walking down; the [flip-flops] could fall off and you're trying to catch your balance and there goes your [flip-flops]." Sardina himself admitted that flip-flops provide less support than shoes when the foot is wet. Given Captain Medina's testimony about the general danger of flip-flops in a wet environment, and Sardina's own admission that flip-flops allow the foot to "move around" in wet conditions, we find it at least "plausible" that the flip-flops were partially to blame. *See Husain,* 316 F.3d at 835.

**IV. Pain and Suffering**

In calculating its damages award for pain and suffering, the Trial Division compared Sardina's case to various other cases in American Samoa in which damages were awarded. The court also noted that general damages in American Samoa were justifiably lower than the damages awards found in cases from American jurisdictions, in part because of the difference in the price of goods and services here and differing attitudes towards pain. The court took into account the severe pain and grief Sardina suffered between the time of his injury and the time he underwent surgery, and the fact that he could never return to his

21

career as a fisherman. It noted, however, that he was fit to return to the workforce in another occupation, that he no longer experienced daily pain, and that he appeared "healthy, good humored, and robust" at the time of trial. It awarded $45,000.00 for pain and suffering.

 Sardina argues that the court's calculation of his general damages award was clearly erroneous because it was based on assumptions about the cost of living of American Samoa, whereas he lives in San Diego, California. But the fact that Sardina does not live in American Samoa does not entitle him to damages in excess of what is generally awarded in this jurisdiction. Although we have justified our generally lower damages awards based on the higher value of the dollar in American Samoa, *see Star-Kist*, 8. A.S.R.2d at 151, we have not attempted to adjust our awards to achieve relative parity with American jurisdictions. To the contrary, we have defended our practice of awarding less in general damages than other American jurisdictions without reference to the market. *See id.* ("That trial judges in American Samoa tend to award lesser sums than those in Texas or California no more suggests that awards in Samoa should be higher than that those in Texas should be lower."). The Trial Division's award thus reflects American Samoa's philosophy on general damages, not simply the cost of goods and services here.

The Trial Division's general damages award is comparable to other damages awards granted in our jurisdiction for injuries of similar severity. *See Clifton*, 29 A.S.R.2d at 99 (awarding $50,000 in general damages to seaman with carpal tunnel syndrome requiring surgery); *see also Moors v. Am. Samoa Gov't*, 19 A.S.R.2d 67, 69 (Trial Div. 1991) (noting that damages awards in American Samoa rarely exceed $50,000). Therefore, it was not clearly erroneous.

## V. Attorneys' Fees Awarded for Sardina's "Cure" Claim

The Trial Division calculated Sardina's "cure" award by taking the total amount of the medical expenses he incurred ($34,221.27), subtracting the payments that TCW Special Credits made toward those expenses ($15,801.21), and awarding the balance ($18,420.06). Finding that the Kassandra Z's failure to pay Sardina "cure" benefits was willful, it also awarded attorneys' fees. Rather than examining the actual cost of litigating the "cure" claim, the Trial Division awarded Sardina $9,210.03, or one-half the amount of his "cure" recovery. Sardina contends that calculating his attorneys' fees as a fraction of the total "cure" award was error, and that the Trial Division should have awarded him an amount equal to the actual legal expenses he incurred. We disagree.

22

Trial courts have broad discretion in calculating an award of attorneys' fees. *See Glynn*, 57 F.3d at 1501. In *Glynn*, the court upheld the trial court's decision to award attorneys' fees for the plaintiff's "maintenance and cure" claim based on a fraction of his recovery, rather than the hours spent and expenses incurred in pursuing the claim, because the claim "did not engender complicated questions of fact or law and constituted only a small portion of the trial." *Id.* The same rationale supports the Trial Division's calculation of attorneys' fees in this case. The Trial Division's "cure" award was relatively small in relation to the special damages awarded for lost future wages, and there is no evidence that Sardina's attorney had to expend inordinate amounts of time or resources to establish Sardina's entitlement to "cure." Sardina cites to *Willard v. Kingston Shipping Co.*, 925 F.2d 721 (4th Cir. 1991), for the proposition that the "lodestar" method should be used to calculate attorneys' fees in admiralty cases. *Id.* at 723. But *Willard* merely recognized that the "lodestar" method was an appropriate means to calculate attorneys' fees in admiralty; it did not hold that it was the *only* appropriate means. We conclude, therefore, that the Trial Division did not abuse its discretion when it calculated Sardina's attorneys' fees award as a fraction of his recovery.

## VI. Prejudgment Interest

Courts generally have discretion to award prejudgment interest in admiralty torts. 2 Martin J. Norris, *The Law of Seamen* § 30.43 (4th ed. 1985) ("In tort matters in admiralty the allowance of interest is discretionary with the court."). The same is true for Jones Act claims for personal injury that are brought in admiralty. *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir. 1985) ("[W]hen a Jones Act claim is brought under the court's admiralty jurisdiction, and hence the case is tried to the court and not to the jury, the allowance of prejudgment interest is within the discretion of the trial court . . ."); *Williamson v. W. Pac. Dredging Corp.*, 441 F.2d 65, 67 (9th Cir. 1971).[3]

---

[3] Prejudgment interest is not available for Jones Act claims brought at law. *Barrios v. La. Constr. Materials Co.*, 465 F.2d 1157, 1167-68 (5th Cir. 1972). Appellees cite *Panama R.R. v. Johnson*, 264 U.S. 375 (1924), for the proposition that the availability of prejudgment interest should be uniform whether a Jones Act claim is brought at law or in admiralty. But *Panama Railroad* did not hold that the Jones Act limits the remedies available to seamen who bring a claim in admiralty to the same remedies available at law. 264 U.S. at 391 (holding that the Jones Act "does not encroach on the admiralty jurisdiction intended by the Constitution, but permits that jurisdiction to be invoked and exercised as it has been from the beginning").

23

 Trial courts must generally exercise their discretion in favor of awarding prejudgment interest in admiralty tort claims. *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1550-51 (11th Cir. 1987).

> As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. Discretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest.

*Id.* at 1550 (quoting *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. Unit A 1980)); *see also City of Milwaukee v. Cement Div., Nat'l. Gypsum Co.*, 515 U.S. 189, 195 (1995) (holding that prejudgment interest should be awarded in maritime collision cases, except in "peculiar" or "exceptional circumstances"). Where "peculiar circumstances" justify the denial of prejudgment interest, courts must make findings of fact identifying those circumstances in order to facilitate appellate review. *Self*, 832 F.2d at 1551. A court's failure to make findings of fact to support the denial of prejudgment interest on an admiralty tort claim constitutes an abuse of discretion. *Simeonoff v, Hiner*, 249 F.3d 883, 894 (9th Cir. 2001) ("When a district court fails to articulate any reason why prejudgment interest was denied, the district court abuses its discretion in refusing to award prejudgment interest.") (citation omitted).

In *Cleveland Tankers v. Tierney*, 169 F.2d 622 (6th Cir. 1948), the Sixth Circuit held that prejudgment interest was *not* available for maritime tort claims. *Id.* at 626 ("It is the general practice in admiralty, in ascertaining interest in personal injury and death claims, to allow interest by way of damages from the date that the damages have been judicially determined."). The Trial Division recently adopted the Sixth Circuit's rule in *Clifton*, where it held that prejudgment interest is not allowed on either Jones Act or unseaworthiness claims.[4] 29 A.S.R.2d. at 99 (citing *Cleveland Tankers*, 169 F.2d 622). But, as we have noted above, most federal circuit courts have disagreed with that view. We likewise disagree. As the United States Supreme Court recently held, "[f]ull compensation has long been recognized as a basic principle of admiralty law . . . ." *City of Milwaukee, 515* U.S. at 195-96. "By compensating for the loss of use of money due as damages from the time the claim accrues until judgment is entered, an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury

---

[4] The Trial Division has, however, recognized that in other contexts "the general rule is to award prejudgment interest." *See Interocean Ships, Inc. v. Samoa Gases*, 26 A.S.R.2d. 28, 43 (Trial Div. 1994).

occurred." *Id.* at 196 (citations and internal quotation marks omitted). We therefore join the majority of the federal circuit courts and hold that prejudgment interest is available for maritime tort claims, including Jones Act claims brought under the trial court's admiralty jurisdiction.

The Trial Division had discretion to award Sardina prejudgment interest on his "unseaworthiness" and "maintenance and cure" claims because they were brought under the court's admiralty jurisdiction. *See* A.S.C.A. § 3.0208(a)(3). It also had discretion to grant prejudgment interest on Sardina's Jones Act claim because Sardina designated it as an admiralty claim in his complaint. T.C.R.C.P. 9(h) ("A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the High Court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim . . . ."). Accordingly, we remand this case to the Trial Division with instructions to either award prejudgment interest or make findings of fact to support its decision not to do so. *See Simeonoff,* 249 F.3d at 894.[5]

## Conclusion

For the foregoing reasons, we affirm the judgment of the Trial Division in all respects,[6] except that we vacate the award and remand with instructions to award prejudgment interest, unless extraordinary circumstances justify its denial. Each party shall bear his or its own costs on appeal.

AFFIRMED, judgment VACATED and REMANDED.

---

[5] If prejudgment interest is awarded, it should apply only to the damages Sardina suffered prior to the judgment. *See Borges v. Our Lady of the Sea Corp.,* 935 F.2d 436, 444-45 (2d Cir. 1991) (holding that "prejudgment interest may properly be added to damage awards for past lost wages, medical expenses that have been incurred, and past pain and suffering" but not "future loss of earnings, future medical expenses, and/or future pain and suffering").

[6] We lack jurisdiction to consider the Trial Division's denial of maintenance because Sardina failed to raise the issue in his motion for a new trial, which is a jurisdictional prerequisite to appellate jurisdiction. A.S.C.A. § 43.0802(a); *Masaniai v. Siafono,* 17 A.S.R.2d 206, 207 (App. Div. 1990).