**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

R. ALEXANDER ACOSTA, Secretary of Labor,

*Plaintiff-Appellee*,

v.

SCOTT BRAIN,

*Defendant-Appellant*,

and

MELISSA W. COOK; MELISSA W. COOK & ASSOCIATES, PC,

*Defendants.*

No. 16-56529

D.C. No.
2:14-cv-03911-JAK-AGR

| | |
|---|---|
| R. ALEXANDER ACOSTA, Secretary of Labor, *Plaintiff-Appellee*, v. MELISSA W. COOK; MELISSA W. COOK & ASSOCIATES, PC, *Defendants-Appellants*, and SCOTT BRAIN, *Defendant*. | No. 16-56532 D.C. No. 2:14-cv-03911-JAK-AGR OPINION |

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted April 10, 2018
Pasadena, California

Filed December 4, 2018

Before:  MARY M. SCHROEDER and MILAN D.
SMITH, JR., Circuit Judges, and GERSHWIN A. DRAIN,[*]
District Judge.

---

[*] The Honorable Gershwin A. Drain, United States District Judge
for the Eastern District of Michigan, sitting by designation.

Opinion by Judge Milan D. Smith, Jr.;
Partial Dissent by Judge Schroeder

## SUMMARY[**]

### ERISA

The panel affirmed in part, reversed in part, and vacated in part the district court's judgment in a civil enforcement action brought by the Secretary of the Department of Labor against Scott Brain, a former trustee, and Melissa Cook and Melissa W. Cook & Associates, PC, former counsel to the Cement Masons Southern California Trust Funds, alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

The action alleged violations of two sections of ERISA – unlawful retaliation in violation of ERISA section 510, 29 U.S.C. § 1140, and breach of fiduciary duty in violation of ERISA section 404, 29 U.S.C. § 1104.

The panel held that the district court did not err in concluding that Brain violated ERISA section 510 by retaliating against whistleblower Cheryle Robbins, the Director of the Trust Funds' internal Audit and Collections Department. The panel held that Robbins's participation in the Department of Labor ("DOL") investigation of Brain was unmistakably protected activity under ERISA, and constituted an independently sufficient ground for the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court's conclusion.  The panel noted that there was a circuit split on the issue of whether "unsolicited internal complaints" constituted protected activity within the meaning of ERISA section 510, but concluded that the issue of Robbins's letter-writing being protected activity was immaterial where Robbins's cooperation with the DOL investigation provided an independent basis for the section 510 claim.

The panel held that the district court did not err in concluding that Robbins's protected activity was the but-for cause of Robbins being placed on leave.  The panel assumed, without deciding, that the higher but-for causation standard applied.  The panel held that the fact that Brain was not the ultimate decisionmaker – where  a group of trustees were the ones voting to place Robbins on leave – did not immunize him under a "cat's paw" theory of liability given that Brain was the one who set the vote into motion.

The panel held that the district court erred in concluding that Brain breached his fiduciary duty in violation of ERISA section 404 by placing Robbins on administrative leave.  The panel held that the district court erred by not addressing the threshold "two-hat" inquiry of whether Brain was wearing his ERISA fiduciary hat when he took the action alleged in the Secretary of DOL's complaint.  The panel further held that the Secretary's overbroad use of the phrase "management and administration" – to argue that Brain was acting as an ERISA fiduciary when he caused Robbins to be placed on leave – contravened Supreme Court authority. The panel held that it necessarily followed that the district court erred in concluding that the Cook Defendants violated section 404 by knowingly aiding Brain in violating section 404.

The panel held that the district court erred in basing the permanent injunction on ERISA section 409. The panel held that because section 409 required a breach of fiduciary duty, and because the Secretary did not prove that there was a breach of fiduciary duty in this case, the permanent injunction was vacated in its entirety as to Brain and the Cook Defendants. The panel held that ERISA section 502(a)(5) did not provide an alternative basis for the district court's permanent injunction where no aspect of the district court's injunction redressed or enforced a violation of ERISA section 510.

The panel held that the district court did not err in determining that the Cook Defendants were not immune under the attorney immunity doctrine. The panel further held that the Cook Defendants' remaining arguments were meritless.

Judge Schroeder dissented in part. Judge Schroeder agreed with the majority's affirmance of the district court's ruling that Brain violated ERISA by retaliating against Robbins, but disagreed with the majority's conclusion that the retaliatory act – placing Robbins on administrative leave – was not a breach of Brain's fiduciary duty, and disagreed with the majority's decision to vacate the injunction.

## COUNSEL

Melissa W. Cook (argued), Melissa W. Cook & Associates, San Diego, California; Peter Morris (argued) and L. Rachel Lerman, Barnes & Thornburg LLP, Los Angeles, California; Brian E. Casey, Barnes & Thornburg LLP, South Bend, Indiana; for Defendants-Appellants.

Blair L. Byrum (argued), Trial Attorney; Thomas Tso, Counsel for Appellate and Special Litigation; G. William Scott, Associate Solicitor, Plan Benefits Security; Nicholas C. Geale, Acting Solicitor of Labor; United States Department of Labor, Washington, D.C.; for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant Scott Brain, a former trustee of the Cement Masons Southern California Trust Funds (the Trust Funds), and Defendants-Appellants Melissa Cook and Melissa W. Cook & Associates, PC (collectively, the Cook Defendants), former counsel to the Trust Funds, appeal from the district court's entry of judgment against them in a civil enforcement action brought by Plaintiff-Appellee the Secretary of the Department of Labor (the Secretary). The action alleges violations of two sections of the Employee Retirement Income Security Act of 1974 (ERISA)—unlawful retaliation in violation of ERISA section 510, 29 U.S.C. § 1140, and breach of fiduciary duty in violation of ERISA section 404, 29 U.S.C. § 1104.

After conducting a bench trial, the district court concluded that Brain and the Cook Defendants violated ERISA sections 510 and 404. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court with respect to the ERISA section 510 claim, but reverse with respect to the ERISA section 404 claim, and vacate the district court's entry of a permanent injunction against Brain and the Cook Defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

The Trust Funds are five employee benefit trust funds established by Cement Masons Local 500, Cement Masons Local 600, and four employer contractor associations pursuant to collective bargaining agreements. Each of the Trust Funds has its own Board of Trustees. The Joint Board of Trustees (Joint Board), comprised of trustees for the five trusts, coordinates administration of the Trust Funds.

Brain was the business manager and financial secretary for the Cement Masons Local 600, a trustee for each of the Trust Funds, and a member of the Joint Board. Cook and her law firm served as counsel to the Trust Funds from August 2005 through May 2013.

The Trust Funds had an internal Audit and Collections Department (A&C Department) that was responsible for auditing employers and collecting overdue or otherwise unpaid employer contributions. Cheryle Robbins was the director of the A&C Department. The Trust Funds established a Joint Delinquency Committee (JDC), composed of trustees, to oversee the A&C Department, as well as the Cement Masons Southern California

Administrative Corporation (Administrative Corporation) to employ A&C Department staff.

The Trust Funds hired Zenith American Solutions (Zenith), to provide third-party administrative services to the Trust Funds.  Cory Rice was a Zenith employee who worked on the Trust Funds' matters.  The Trust Funds' primary contact at Zenith was manager Bill Lee.

## B.  Robbins's Concerns About Brain

Beginning in as early as 2006, Robbins expressed to several trustees her concerns that Brain was interfering with the A&C Department's collection efforts.  Robbins's concerns stemmed from several incidents over a number of years.  For example, Brain allegedly told certain contractors who owed smaller contributions to the A&C Department to "fly under the radar," and he often interpreted certain agreements "in a manner that reduced the amount owed by covered contractors."

## C.  The Audit of the A&C Department

In March and April of 2011, the JDC began to consider hiring an outside firm to audit the A&C Department.  On September 8, 2011, the JDC convened and voted to move forward with an external audit.  The JDC asked Cook to prepare audit procedures and solicit bids from auditing firms.  Kathryn Halford, the Trust Funds' collections counsel, and trustee David Allen, who had an accounting background, reviewed the audit procedures Cook drafted. Allen informed Cook and Halford of his concern that the proposed procedures violated Generally Accepted Accounting Procedures.  The district court found that the audit procedures "appear[ed] to have been created in an

effort to influence the outcome by increasing the likelihood of a finding that the A&C Department was not well run."

On October 13, 2011, the JDC decided on two finalists to perform the audit, Bond Beebe and Hemming Morse, and scheduled the firms to present at a JDC meeting on November 18, 2011.

### D. Brain and Cook's Romantic Relationship

By October 2011, or "very shortly thereafter," the "close, personal relationship" between Brain and Cook became romantic. They misled other trustees about their relationship during this time, and Cook failed to disclose the relationship. They communicated extensively with each other, exchanging "a substantial amount of flirtatious comments," and staying in constant contact during the events described below.

### E. Robbins's Protected Activity

On October 11, 2011, Robbins and Rice met with Allen to discuss Brain's purported misconduct. At the time, Allen shared Robbins's concerns and wanted Brain removed. Allen proposed drafting a letter to the president of the Operative Plasterers' and Cement Masons International Association (OPCMIA or International Union), because the OPCMIA could remove Brain from his position as Local 600 Business Manager, which would result in Brain losing his position as trustee. Subsequently, Rice sent Allen an email describing Brain's alleged misconduct for use in the letter to the OPCMIA. In his email, Rice alleged that Brain acted "to reduce amounts owed to Fund" and "advise[d] contractor[s] how to handle audit[s]," and he expressed "concerns about our own trust attorney," referring to Cook.

On October 14, 2011, DOL investigator Matt Chandler contacted Robbins and informed her that he was conducting a criminal investigation of Brain. Robbins was not the initial whistleblower to the DOL. Rather, Chandler's call was the result of a complaint made by Thomas Mora, the OPCMIA vice president, at some point between March and May of 2011. Mora had concerns about Brain's conduct based on conversations with Robbins, Halford, and two trustees. Robbins reported Chandler's call to Halford and Allen, who in turn informed Cook on October 26, 2011.

**F. The Plan to Remove Robbins**

After learning about Robbins's contact with the DOL, Cook and Brain called a special Joint Board meeting into session. Cook stated that the meeting's purpose was to discuss whether to outsource the A&C Department's work, but the district court found that Cook and Brain actually intended to remove Robbins.

Leading up to the special Joint Board meeting, Cook and Allen exchanged several text messages and phone calls about Robbins, and they discussed outsourcing the A&C Department's work to Zenith. Although Allen had participated in the earlier effort to report Brain's alleged misconduct to the OPCMIA, Allen distanced himself from Robbins after he learned about her contact with the DOL.

On November 11, 2011, Cook told Allen that she believed a special Joint Board meeting should take place immediately after the JDC meeting scheduled for November 18, 2011, and stressed that the meeting must occur before outsourcing the A&C Department's work to Zenith. Allen then scheduled the meeting.

The district court found that in the few days prior to the meeting, "Brain and Cook were 'firing up' their allies for the actions that would be taken in response to Robbins'[s] contacts with the DOL, not for a more pedestrian discussion about a potential change to the performance of the functions of the A&C Department." They wanted to "line up their votes at the meeting for the positions that they planned to advance," and even jokingly referred to their scheme as "[r]evisionist history."

At some point between November 14, 2011 and November 18, 2011, Robbins asked Chandler to issue a DOL subpoena for the Trust Funds' records, because both Cook and her personal counsel had instructed Robbins not to provide any records voluntarily to the DOL. She urged Chandler to move quickly because she feared she would lose her position.

On November 17, 2011, Robbins received a DOL subpoena and forwarded it to Cook and Halford, telling them that it concerned an investigation of Brain, not of the Trust Funds. Cook reacted furiously to the subpoena and began planning with associate counsel to "put [Robbins] on paid admin leave asap [sic]," stating that she "want[ed] [Robbins] out of there," but "without violating erisa [sic]." Cook's associate suggested "put[ting] [Robbins] on paid admin [sic] leave" because Robbins and the DOL may not be able to obtain "damages or equitable relief." Cook's associate concluded, "I think she should be put on paid leave to at least prevent her from taking out documents," and recommended that the trustees "proceed with the independent audit" of the A&C Department and thereafter "dissolve" the Administrative Corporation and outsource the A&C Department's work.

**G.  The November 18, 2011 Joint Board Meeting**

The scheduled JDC meeting took place on November 18, 2011.  The JDC selected Bond Beebe to perform an audit of the A&C Department.

The special Joint Board meeting immediately followed. First, the trustees voted to solicit bids to evaluate the cost of outsourcing the A&C Department's services.  Next, Cook informed the trustees of the DOL subpoena and Robbins's contact with the DOL.  Cook described Robbins's conduct as inappropriate and made statements that implied inaccurately that Robbins had initiated the DOL's investigation.  Cook made clear she believed Robbins should be placed on leave, saying, "Come on.  You're all smart people here.  Do the right thing."  Next, Brain asked Allen to share how Robbins had pressured him to write a letter to the OPCMIA to complain about Brain.

Brain recused himself from the vote, but remained in the room during the discussion and vote.  Notably, Brain had the power to remove Local 600 trustees or have them terminated from their jobs with the union.  The district court found that Cook and Brain's critical statements of Robbins "created an environment that was hostile to her," and "caused" the trustees to vote unanimously to put Robbins on leave "until . . . the matter pending before the DOL [was] resolved."

**H.  Rice's Termination**

In early December 2011, Cook informed Lee of Rice's role in the efforts to report Brain to the OPCMIA.  Cook told Lee that because of Rice's involvement with the letter, it would be in Zenith's best interest to terminate Rice.  Around the same time, Brain informed Lee that Zenith's work was being put out to bid.  Cook told Brain privately that she

believed Rice and his mother, Louise Bansmer, also a Zenith employee, were "blindly loyal" to Robbins.

Although Lee did not believe that terminating Rice was in the Trust Funds' best interest, and did not feel comfortable terminating him, Cook urged that Rice and Bansmer be "terminated together due to the mother/son connection" because she was fearful of retaliation by Rice. Cook also asked Lee to speak with Brain, who Lee believed had "doubts" and "major concerns" about Rice. Lee's supervisor reminded Lee that Zenith had to do the right thing for its client, and that she was not sure that retaining Rice was "the right thing[;] especially after your conversation with [Brain]." On January 4, 2012, Lee emailed the trustees to inform them that Zenith had terminated Rice and Bansmer.

## I.  Robbins's Termination

Zenith submitted a bid to take over the A&C Department's work on February 13, 2012, but Allen told Zenith to "sharpen [its] pencil" and submit a revised proposal. Allen suggested that Zenith could reduce the cost of its proposal by hiring replacement staff or lowering salaries of A&C Department staff and replacing them if they did not agree to salary reductions. Accordingly, Zenith submitted a revised proposal the next month:

> If [Zenith] is able to hire qualified staff at a lower salary rate than the current staff[,] we will pass the savings on to the Trust Funds. If we are not able to lower salaries (through new people or reduced salaries of current staff)[,] our current fee quote would stand."

During this time, Cook engaged in an unauthorized investigation of Robbins, despite being fully aware that the

DOL investigation centered on Brain's conduct only. Cook reviewed Robbins's phone records, taking note of Robbins's calls with various trustees and calls made in connection with the DOL's investigation. Cook kept Brain apprised of her investigation—she referred to the phone records as a "treasure trove," and to Robbins's placement on administrative leave as when Robbins "got canned."

Cook also asked the Bond Beebe auditor to review hard drives for emails between Robbins and various trustees, as well as emails relating to the DOL investigation or referring to Brain. In their emails discussing Robbins's "termination," Cook and Brain observed, "Its [sic] a lot of work covering [Robbins's] tracks or lack thereof, would be more appropriate!"

Bond Beebe presented its audit findings to the Joint Board on April 12, 2012. In conducting its audit, Bond Beebe interviewed every A&C Department employee except for Robbins, the Department's director. While Bond Beebe gave the A&C Department a "D" grade, it did not recommend outsourcing, but rather gave suggestions for operational improvements.

The trustees and Cook then discussed the audit results. "Cook encouraged the trustees to support outsourcing the services of the A&C Department and to eliminate Robbins." Cook stated that the quality of Robbins's work was subpar, and that Robbins "had to go." After a short deliberation, the trustees voted to dissolve the A&C Department and outsource its functions to Zenith.

Cook urged Lee several times that Robbins should not return to her position as A&C Department director. Subsequently, Zenith hired every A&C Department employee except for Robbins. But Zenith never eliminated

Robbins's position.  Instead, with Cook's assistance, Zenith immediately began to look for Robbins's replacement.  The district court found that there was "no evidence that Lee or any other person at Zenith decided not to hire Robbins due to the quality of her work as director of the A&C Department."

## J.  The Secretary's Action

On May 21, 2014, the Secretary initiated the present civil enforcement action pursuant to ERISA section 502(a)(2) and (a)(5).

On November 21, 2014, the Secretary filed a Second Amended Complaint (SAC) against the Trust Funds, the Joint Board members, the Administrative Corporation, Zenith, Lee, and the Cook Defendants.  The Secretary alleged that the defendants retaliated against Robbins and Rice for attempting to send a letter to OPCMIA regarding their concerns about Brain, and against Robbins for participation in a DOL investigation, in violation of ERISA section 510.  The Secretary also alleged that Brain committed a breach of fiduciary duty in violation of ERISA section 404(a)(1)(A)–(B), and that the Cook Defendants knowingly participated in Brain's breach.  Finally, the SAC alleged that certain defendants were subject to co-fiduciary liability under ERISA section 405(a).

On August 24, 2015, the district court entered a Consent Judgment and Order reflecting a settlement between the Secretary and all defendants except for Briceno, Brain, and the Cook Defendants.  In relevant part, the settlement provided Robbins with $400,000 in lost wages, plus certain benefits, and Rice with $56,000 in lost wages.

**K.  The District Court's Judgment**

The district court conducted a five-day bench trial in May 2016.  On July 25, 2016, the district court issued its findings of fact and conclusions of law.

On October 14, 2016, the district court entered a final judgment and permanent injunction.  The district court entered judgment in favor of the Secretary on the following claims:[1]  The district court found that (1) Brain and the Cook Defendants violated ERISA section 510 by causing Robbins to be placed on paid administrative leave in retaliation for protected conduct; (2) Brain and the Cook Defendants violated ERISA section 510 by causing the termination of Rice in retaliation for protected conduct and for an improper purpose; (3) Brain and the Cook Defendants violated ERISA section 510 by causing the removal of Robbins from her employment with the Administrative Corporation and by preventing her from performing any services or work for the Trust Funds, in retaliation for protected conduct; (4) Brain violated his fiduciary duties to the Trust Funds under ERISA section 404(a)(1)(A)–(B) when he caused Robbins to be placed on paid administrative leave in retaliation for protected conduct; and (5) the Cook Defendants violated ERISA section 404(a)(1)(A)–(B) by knowingly participating in Brain's breach of his fiduciary duties.

The district court ordered that the Cook Defendants disgorge $61,480.62 to the Trust Funds.  The district court also entered a permanent injunction against Brain and the Cook Defendants.  In relevant part, the district court

---

[1] The district court also entered judgment in favor of Brain, the Cook Defendants, and Briceno on several claims.  These issues are not on appeal.

(1) removed Brain as a trustee for any and all of the Trust Funds; (2) permanently enjoined him from serving in any fiduciary capacity, including, but not limited to, serving as a trustee for any of the Trust Funds; (3) permanently enjoined him from applying for or accepting any fiduciary position with any ERISA-covered plan, unless he first discloses the terms of the district court's final judgment and permanent injunction in his application for the position and prior to accepting any such position; (4) terminated any attorney-client relationship between the Cook Defendants and any of the Trust Funds; and (5) permanently enjoined the Cook Defendants from providing any services to any of the Trust Funds.

Brain and the Cook Defendants timely appealed.

## STANDARD OF REVIEW

We review de novo the district court's interpretation of ERISA. *Shaver v. Operating Eng'rs Local 428 Pension Tr. Fund*, 332 F.3d 1198, 1201 (9th Cir. 2003). We review de novo the district court's conclusions of law, but review for clear error the district court's findings of fact. *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002), *aff'd*, 540 U.S. 644 (2004).

## ANALYSIS

### I. The District Court Did Not Err in Concluding that Brain Violated ERISA Section 510 by Retaliating Against Robbins.

Brian challenges the district court's conclusion that he violated ERISA section 510. Brain first argues that the district court erred in concluding that Robbins engaged in protected activity. Brain next argues that the district court

failed to apply properly the but-for standard of causation. We reject both arguments.

### a. The District Court Did Not Err in Concluding that Robbins Engaged in Protected Activity.

ERISA section 510 makes it "unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to [ERISA]." 29 U.S.C. § 1140. To establish a claim of retaliation under section 510, the Secretary must show that: (1) Robbins engaged in an activity protected under ERISA; (2) Robbins suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Teutscher v. Woodson*, 835 F.3d 936, 945 (9th Cir. 2016).

Here, the district court found—and Brain does not dispute—that the DOL contacted Robbins for information, which she provided, in connection with the DOL's investigation of Brain. Robbins thus engaged in prototypical protected activity, and the district court did not err in concluding that Brain violated section 510.

Sidestepping the fact that Robbins participated in the DOL investigation, Brain argues that another activity Robbins participated in was not protected under ERISA. Specifically, Brain contends that Robbins's participation in the effort to report Brain to the OPCMIA was not protected activity. We need not address this argument because Robbins's participation in the DOL investigation was unmistakably protected under ERISA and constitutes an independently sufficient ground for the district court's conclusion.

In any event, Brain's argument is meritless. "One . . . ERISA-protected activity is protesting a legal violation in connection with an ERISA-governed plan." *Id.* (citing *Hashimoto v. Bank of Haw.*, 999 F.2d 408, 411 (9th Cir. 1993)). We have observed that "[section 510] is clearly meant to protect whistle blowers" because "[i]f one is . . . discharged for raising the problem [to the managers of an ERISA plan], the process of giving information or testifying is interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is blown." *Hashimoto*, 999 F.2d at 411. Robbins's letter writing falls within the ambit of "protesting a legal violation in connection with an ERISA-governed plan." *Teutscher*, 835 F.3d at 945. Although the intended recipient of the letter—the president of the OPCMIA—was not an internal manager of the Trust Funds, the district court found that the OPCMIA "could have acted to remove Brain as a Local 600 Business Manager," and that "[i]f it had done so, [Brain] would have lost his position as a trustee." Since Robbins's aim in writing the letter was to remove Brain from his position, the fact that the intended recipient of the letter was an outside party is inconsequential.[2] *Cf. id.* at 940

---

[2] There is a circuit split on the issue of whether "unsolicited internal complaints" constitute protected activity within meaning of ERISA section 510. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 220–22 (3d Cir. 2010). While the Fifth, Seventh, and Ninth Circuits have recognized unsolicited employee complaints as protected activity for purposes of section 510 claims, the Second, Third, Fourth, and Sixth Circuits have reached a contrary conclusion. *See id.* (citing and discussing cases); *see also Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 340–42 (6th Cir. 2014) (same). Nonetheless, as we noted above, whether Robbins's letter-writing was protected activity is ultimately immaterial, because Robbins's cooperation with the DOL's investigation provides an independent basis for the Secretary's section 510 claim. Furthermore, *Hashimoto* is still the law in our court. Although Brain asks the panel to revisit *Hashimoto*, Brain has not identified "intervening

(reviewing an ERISA retaliation claim where the plaintiff complained to the Riverside Sherriff's Department, an outside party, about potential ERISA violations by the Riverside Sheriffs' Association, an organization that administers an ERISA-governed plan).

> **b. The District Court Did Not Err in Concluding that Robbins's Protected Activity Was the But-For Cause of Robbins Being Placed on Leave.**

We begin by addressing the threshold question of which standard of causation applies—the but-for standard or the substantial factor standard. In a past decision, we used language suggestive of the substantial factor standard in describing ERISA section 510. *See Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990) ("[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination."). However, in two recent decisions, the Supreme Court held that the use of "because" or "because of" in statutory text mandates but-for causation. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (holding that the standard of causation in Title VII retaliation claims is but-for causation, because the statute prohibits retaliation against an employee "because" of certain protected activity); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009) (holding that the standard of causation in an ADEA discrimination claim is but-for causation, because the statute prohibits retaliation against an employee "because of" age). Like Title VII and the ADEA, ERISA

---

higher authority" with which our prior authority is "clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

section 510 also uses "because." 29 U.S.C. § 1140. Following *Nassar* and *Gross*, the district court concluded that the but-for causation standard applied. We assume, without deciding, that the higher but-for causation standard applies here.[3]

We now turn to the district court's application of the but-for causation standard, and hold that the district court did not err in concluding that Brain and the Cook Defendants caused Robbins to be placed on leave.

Citing nonbinding authority, Brain argues that he is immune from liability because "when a majority of a group decides to take action for non-retaliatory reasons, none of the group is liable." However, Brain sidesteps two important distinctions. Brain was not part of the group of trustees that voted to place Robbins on leave, but was responsible for setting the vote in motion. In addition, the Secretary was not seeking to hold the whole Joint Board liable at trial. But for Brain's orchestrating the vote to place Robbins on leave, the Joint Board would not have done so.

We have recognized this so-called "cat's-paw" theory in cases even more attenuated than the present one. In *Poland v. Chertoff* we held:

> [I]f a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the

---

[3] We need not decide this question because the issue of which standard applies is not on appeal, and the application of the stricter but-for standard does not affect the resolution of this case.

> employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

494 F.3d 1174, 1182 (9th Cir. 2007).  Here, there is one less level of liability to establish, as the Secretary did not seek to impute Brain's retaliatory motive upward to his employer. Rather, the Secretary sought to prove only Brain's liability by showing that in response to Robbins's protected activity, Brain, who had significant authority over the Board members, "set[] in motion a proceeding by an independent decisionmaker that le[d] to an adverse employment action." *Id.*

Contrary to Brain's contention, the district court did not impermissibly water down the but-for causation standard. The fact that Brain was not the ultimate decisionmaker does not immunize him under a cat's-paw theory of liability.  At least four of our sister circuits have concluded that a cat's-paw theory of liability for retaliation is compatible with the but-for causation standard, and still viable after *Nassar*.  *See Zamora v. City of Houston*, 798 F.3d 326, 331–32 (5th Cir. 2015) (citing cases).  As the Fifth Circuit observed,

> Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any retaliatory animus.   Under this theory, a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action.

> Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action.

*Id.* at 331. Noting that the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411, 416–17, 419–22 (2011), had previously "explicitly blessed the use of cat's paw analysis in the context of an employment claim requiring that the unlawful animus be a 'motivating factor' for the employer's action," the Fifth Circuit explained that *Nassar* did not eliminate the availability of the cat's-paw theory. *Id.* at 332. Rather, "in *Nassar*, the Court changed only the strength of the causal link—between the supervisor's actions and the adverse employment action—that the plaintiff must establish." *Id.* "*Nassar* says nothing about whether a supervisor's unlawful animus may be imputed to the decisionmaker; it simply requires that the supervisor's influence with the decisionmaker be strong enough to actually cause the adverse employment action." *Id.*

Here, the same reasoning applies. That the causal link between Brain's actions and Robbins's placement on administrative leave must be strong does not speak to the issue of whether Brain's retaliatory motive may be imputed to the ultimate decisionmaker. Rather, Brain's "influence with the decisionmaker [must] be strong enough to actually [have] cause[d] the adverse employment action." *Id.*

Brain notes that only a minority of the trustees on the Joint Board cited Robbins's protected activity as a basis for voting to place Robbins on leave. Crucially, Brain does not contest or even mention the district court's findings of fact regarding how he and the Cook Defendants set in motion the vote to place Robbins on leave. His arguments effectively

boil down to urging us to reweigh the evidence before the district court.

We decline to do so. The district court discounted the weight of the non-retaliatory reasons provided by the voting trustees, characterizing their explanations as "vague" and insufficient to state a legitimate, non-retaliatory reason for placing Robbins on leave. Moreover, the majority of the evidence stemmed from deposition testimony taken while the trustees were still named defendants in the action. The district court concluded that the fact that the witnesses still faced potential liability significantly affected the weight of their testimony.

Furthermore, the district court laid out lengthy findings of fact showing how Brain and the Cook Defendants set the vote in motion in order to retaliate against Robbins. Without recapitulating the district court's findings in full, we note a few key ones. The district court found "substantial evidence that Cook and Brain frequently communicated through phone calls, text messages and emails during the weeks prior to the November 18, 2011 meeting at which Robbins was put on leave." In fact, "Cook, Brain and Allen called th[e] special meeting" at which the vote to put Robbins on leave occurred. Not only did Brain have an incentive to retaliate, but Cook did as well, as they had begun a romantic relationship at the time.

Moreover, after Cook, Brain, and Allen called the special meeting, "Brain and the Cook Defendants coordinated efforts to talk with other trustees with whom they had positive relationships" before the meeting "in an effort to line up their votes at the meeting for the positions they planned to advance." Brain and Cook sent messages to each other saying that they were "firing up" other trustees, "lining

up [Brain's] peeps [sic]," and informing the trustees of the actions planned for the meeting.

At the meeting itself, Brain and Cook took control by discussing Robbins's contact with the DOL and the DOL subpoena, and making "statements critical of Robbins," thus "creat[ing] an environment that was hostile to her." Of note, they made statements suggesting that Robbins had in fact initiated contact with the DOL, rather than the other way around, in an effort to lead the trustees to "regard her as disloyal." Cook encouraged the trustees to vote to place Robbins on leave, and Brain prompted Allen to discuss the draft letter to the OPCMIA and Robbins's role in "pressuring" him repeatedly to write it.

Importantly, Brain remained in the room, although he abstained from voting. The district court found that "his mere presence could have influenced others," as Brain had the power to remove Local 600 trustees or have them terminated from their jobs with the union.

"The district court, as the trier of fact in this matter, was in a superior position to appraise and weigh the evidence, and its determination regarding the credibility of witnesses is entitled to special deference." *Husain*, 316 F.3d at 840. We decline Brain's invitation to reweigh the evidence or second-guess the district court's credibility determinations, as Brain has not argued, much less shown, that the district court clearly erred in in its fact finding. The record is rife with evidence establishing but-for causation, and Brain's attempts to recast the evidence are unavailing. We accordingly conclude that the district court properly applied the but-for standard of causation to the facts before it, and did not err in concluding that the standard was met.

**II. The District Court Erred in Concluding that Brain Breached His Fiduciary Duty in Violation of ERISA Section 404.**

Congress designed ERISA "'to ensure that employees will not be left empty-handed' by imposing fiduciary duties on those responsible for management of [private employee benefit] plans." *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 836–37 (9th Cir. 2018) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)). There are two general categories of fiduciaries under ERISA—named (or statutory) and functional. *Id.* at 837.

> [T]he term 'named fiduciary' means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

29 U.S.C. § 1102(a)(2). A party not named in the plan instrument can become a functional fiduciary. *Id.* § 1002(21)(A). Specifically,

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or

responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.*; *see Santomenno*, 883 F.3d at 837.

"Whether named or functional, an ERISA fiduciary has a 'duty of care with respect to management of existing . . . funds, along with liability for a breach of that duty.'" *Santomenno*, 883 F.3d at 837 (quoting *Lockheed Corp.*, 517 U.S. at 887). "Under two of the prongs of the functional fiduciary definition" enumerated in § 1002(21)(A)(i) and (iii), "[o]nly discretionary acts of plan . . . management trigger fiduciary duties." *Id.* at 838 (alterations in original) (quoting *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 293 (3d Cir. 2014)).

ERISA section 404(a)(1) outlines the "prudent man standard of care" that governs ERISA fiduciaries:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries *and*—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; *and*

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; *and*

(D) in accordance with the documents and instruments governing the plan . . . .

29 U.S.C. § 1104(a)(1) (emphases added).

The Supreme Court has repeatedly emphasized the "two-hat" principle of fiduciary duties under ERISA. The Court has observed that "the analogy between ERISA fiduciary and common law trustee becomes problematic" after a certain point because, unlike a trustee at common law who "characteristically wears only his fiduciary hat when he takes action to affect a beneficiary," a "trustee under ERISA may wear different hats," and "may have financial interests adverse to beneficiaries." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000). For example, a fiduciary, when acting as an employer, wears his or her employer hat, not his or her fiduciary hat:

Employers . . . can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (*e.g.,* firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (*e.g.,* modifying the terms of

a plan as allowed by ERISA to provide less generous benefits).

*Id.* Accordingly, "ERISA . . . require[s] . . . that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat *when making fiduciary decisions*." *Id.* (emphasis added).

Importantly, ERISA "does not describe fiduciaries simply as administrators of the plan, or managers or advisers. Instead it defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan." *Id.* at 225–26 (quoting 29 U.S.C. § 1002(21)(A)). Thus,

> [i]n every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, *was performing a fiduciary function*) when taking the action subject to complaint.

*Id.* at 226 (emphasis added); *see also Santomenno*, 883 F.3d at 838 ("The Supreme Court has stressed that the central inquiry is whether the party was acting as an ERISA fiduciary 'when taking the action subject to complaint.'" (quoting *Pegram*, 530 U.S. at 226)). Simply put, "ERISA's definition of 'fiduciary' is functional rather than formal." *Santomenno*, 883 F.3d at 841 (quoting *Parker v. Bain*, 68 F.3d 1131, 1139 (9th Cir. 1995)).

This threshold "two-hats" inquiry is important "[b]ecause virtually every business decision an employer

makes can have an adverse impact on an employee benefit plan." *In re Luna*, 406 F.3d 1192, 1207 (10th Cir. 2005). "[C]ourts must 'examine the conduct at issue to determine whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties.'" *Id.* (quoting *COB Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir. 2004)). "This is so even where some of the decisions personally benefitted the employer . . . ." *Id.*

Here, the district court concluded that Brain breached his fiduciary duty under section 404 by placing Robbins on administrative leave.**[4]** However, as Brain correctly

---

**[4]** The district court concluded as follows:

> The DOL has shown by a preponderance of the evidence that Brain breached his fiduciary duty by engaging in retaliatory conduct against Robbins, and that the Cook Defendants knowingly participated in that breach. The requirement in § 404 of ERISA that a fiduciary discharge duties "solely in the interest of the participants and beneficiaries" includes an obligation not to violate other ERISA provisions to the detriment of the plan participants and beneficiaries. The obligations of a fiduciary include a duty to "deal fairly" with others in transactions. *See Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1070 n.7 (9th Cir. 2005). This includes a duty not to interfere with the exercise by another person of his or her rights under ERISA.

The district court's citation to a footnote in *Peralta* does not dispose of the threshold inquiry of whether Brain was performing a fiduciary function when placing Robbins on leave. In other words, there is no dispute that an ERISA fiduciary is subject to certain fiduciary duties *when* wearing his or her fiduciary hat. In addition, the district court

observes, the district court did not address the threshold question of whether Brain was wearing his ERISA fiduciary hat when he took the actions alleged in the Secretary's Complaint. Indeed, we lack basic information such as whether Brain was a named or a functional fiduciary, and the Secretary has not pointed to any evidence in the record—such as the written instrument governing the plan—to elucidate this issue.

Nor has the Secretary cited any authority establishing that placing Robbins, an employee of the Administrative Corporation, on leave was a fiduciary function under ERISA, rather than a corporate or business operations action. The case law weighs heavily against the Secretary's position. [5]

---

construed the *Peralta* footnote too broadly—the footnote is much narrower in reality. *See Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1070 n.7 (9th Cir. 2005) (noting in a parenthetical that under the common law of trusts, trustees have "a duty of loyalty . . . to 'administer the trust solely in the interest of the beneficiaries' and . . . 'a duty to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the transaction'" (quoting Restatement (Second) of Trusts § 170 (1992))).

[5] *See, e.g.*, *Bodine v. Emp'rs Cas. Co.*, 352 F.3d 245, 251 (5th Cir. 2003) (concluding that the defendant's "failure to terminate the Employees' employment" was a business decision and not a breach of a fiduciary duty under section 404); *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1499 (3d Cir. 1994) ("[T]he appellants' decision to reduce [the plaintiff's] compensation . . . was managerial in character. The fact that this decision may not have been in [the plaintiff's] interest makes no difference."); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 918 (3d Cir. 1990) ("[I]n making the decision as to whether the Employees' retirements were in the company's interest, [the defendant] was acting in its capacity as employer and not as a fiduciary under ERISA.");

Instead, the Secretary uses the phrase "management and administration" loosely to argue that Brain was acting as an ERISA fiduciary when he caused Robbins to be placed on leave.  Not only does the Secretary ignore the threshold "two-hat" inquiry, but his overbroad approach also contravenes the Supreme Court's express warning that the ERISA "statute does not describe fiduciaries simply as administrators of the plan, or managers or advisers.  Instead it defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan." *Pegram*, 530 U.S. at 225–26 (quoting 29 U.S.C. § 1002(21)(A)).  Contrary to the Secretary's approach, we must distinguish between a fiduciary "acting in connection with its fiduciary responsibilities" with regard to the plan, as opposed to the same individual or entity "acting in its corporate capacity." *Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1432 (9th Cir. 1986) (concluding that "[t]he decision

---

*Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1080 (4th Cir. 1989) (concluding that the defendant "was acting in its capacity as [the plaintiff's] employer, not as a fiduciary, when it decided to discharge him"); *cf. Husvar v. Rapoport*, 430 F.3d 777, 782 (6th Cir. 2005) (concluding that a complaint that "does *not* challenge the actions of a plan fiduciary," but instead "merely questions the propriety of certain business decisions made by the company's board of directors" is insufficient to support a claim of breach of fiduciary duty under ERISA, despite the fact that the business decisions at issue "affected the value of the company stock that comprised the employees' benefit plan assets"); *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 88 (2d Cir. 2001) ("Because GE's decision to spin-off the division along with its pension plan was, at its core, a corporate business decision, and not one of a plan administrator, GE was acting as a settlor, not a fiduciary, when it transferred the surplus to Lockheed."); *Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992) (noting that although "[a]n employer's business decisions will often indirectly affect an ERISA plan or its beneficiaries," individuals "who make such corporate decisions" and who "also happen to be ERISA fiduciaries" are not subject to liability under ERISA section 404).

to terminate the Plan was a business decision that properly rested with Ward's corporate offices"). Only the former triggers fiduciary status; the latter does not. *See id.*; *see also Lockheed Corp.*, 517 U.S. at 890 ("'[O]nly when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration,' does a person become a fiduciary under [§ 1002(21)(A)]." (quoting *Siskind v. Sperry Ret. Program, Unisys*, 47 F.3d 498, 505 (2d Cir. 1995))).

Furthermore, the text of ERISA section 404 speaks plainly of fiduciary duties owed to participants and beneficiaries, but not to employees. Although section 404 is conjunctive, the Secretary tellingly focuses only on the first full clause of the statute, which requires that "a fiduciary . . . discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). The statute does not stop there, however. It continues on, requiring a fiduciary to discharge his duties not only "solely in the interest of the participants and beneficiaries," but *also* for the sole purpose of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The plain text of the statute thus underscores the fact that ERISA fiduciary duties run to the interests of participants and beneficiaries of an ERISA plan. *Cf. Tibble v. Edison Int'l*, 843 F.3d 1187, 1194 (9th Cir. 2016) (recognizing breach of fiduciary duty claim for "failure to exercise prudence" in monitoring and managing plan investments); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 909 (9th Cir. 2001) (recognizing breach of fiduciary duty claim for self-dealing in plan administration). In contrast, the text says nothing about employees, let alone anything about fiduciary duties owed in the course of managing employees. Thus, the Secretary's contention that

Brain's fiduciary duty of loyalty extended to all of "his dealings with people, like Robbins, who serve the plan and its administration," is overbroad and is not based on recognized authority.

For the first time on appeal, the Secretary argues that Brain's fiduciary duties extended to "decisions to hire, fire, or discipline plan service providers, such as Robbins and the A&C Department, and how to compensate them." This argument is meritless. To start, the district court did not find that Brain breached his fiduciary duty by causing the A&C Department's work to be outsourced to Zenith. Rather, the district court found that Brain breached his fiduciary duty by causing Robbins to be placed on leave. Even more fundamentally, the Secretary has not shown how Robbins's position was akin to that of a professional service provider.[6] *E.g.*, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (recognizing actuaries as service providers); *Bui v. AT&T Co.*, 310 F.3d 1143, 1146 (9th Cir. 2002) (recognizing a company that "contracted to provide emergency medical advice and evacuation services" as a service provider). Professional service providers are typically designated through the relevant plan instruments and documents, *see*

---

[6] To the extent the Secretary argues that placing Robbins on leave somehow interfered with *Robbins's* ability to carry about a fiduciary function, the Secretary has provided no evidence supporting such an assertion. Service providers generally occupy advisory, instead of fiduciary, roles in relation to ERISA plans. *Cf. Mertens*, 508 U.S. at 262 (emphasizing that service providers are liable for damages only when they "cross the line from advisory to fiduciary"). Thus, the Secretary's argument requires several layers of attenuation. It is too conjectural to conclude that Brain was wearing his fiduciary hat when he caused Robbins—who the Secretary has not shown to be a service provider, and who, even if she were a service provider, may or may not have been a fiduciary in any given instance—to be placed on leave.

29 C.F.R. § 2509.75-8, FR-14; *Bui*, 310 F.3d at 1150 (noting that the service provider was designated in the plan), none of which we have before us.

The Secretary further argues, again for the first time on appeal, that Brain's decision to place Robbins on leave harmed plan participants and beneficiaries, as Cook received over $60,000 from the Trust Funds for her services. This argument also fails.   First, and fundamentally, the Secretary's argument does not satisfy the threshold "two-hat" inquiry.   Second, the district court did not base its section 404 conclusion on the Trust Funds' payments to Cook. Rather, it concluded that Brain violated section 404 by causing Robbins to be placed on leave.

Third, even if the fees could constitute harm to plan participants and beneficiaries, the Secretary makes no effort to prove the extent of the harm.  The Secretary does not disaggregate the fees incurred from the alleged violation of section 404 from the proven violation of section 510. Indeed, the district court noted that the vast majority of the fees stemmed from charges incurred after Robbins was placed on leave, and included charges incurred as late as April 2013, indicating that most of the fees are not related to Robbins's placement on leave.

Fourth, Brain and Cook's retaliatory animus toward Robbins was, at bottom, personal:  Robbins cooperated in a DOL criminal investigation of *Brain*, not the Trust Funds. Critically, the Secretary failed to allege or prove any standalone breach of fiduciary duty independent of Brain's retaliatory conduct.  The district court concluded that the Secretary untimely raised its section 404 claim that Brain failed to pursue all monies to which the Trust Funds may have been entitled from contractors, and failed to prove that

Brain breached any fiduciary duty to investigate Robbins's allegations against him.

We thus hold that the district court erred in concluding that Brain violated section 404.  It also necessarily follows that the district court erred in concluding that the Cook Defendants violated section 404 by knowingly aiding Brain in violating section 404.

### III.    The District Court Erred in Basing the Permanent Injunction on ERISA Section 409.

ERISA section 503(a)(2) provides that a civil action may be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under [ERISA section 409]."  29 U.S.C. § 1132(a)(2).  Section 409, in turn, provides for removal of a fiduciary who has breached his or her fiduciary duties under ERISA:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

Expressly relying upon ERISA section 409, the district court entered a permanent injunction against Brain and the Cook Defendants.  For the reasons discussed above, the Secretary did not establish that Brain and the Cook Defendants violated ERISA section 404.  Because section 409 requires a breach of fiduciary duty, and because the Secretary did not prove that there was a breach of fiduciary duty in this case, we vacate the permanent injunction in its entirety as to Brain and the Cook Defendants.

### IV.  ERISA Section 502(a)(5) Does Not Provide an Alternative Basis for the District Court's Permanent Injunction.

As a fallback position, the Secretary argues that notwithstanding the absence of a violation of section 404, a violation of section 510 may serve as an independent basis for the district court's injunction.  We disagree.

ERISA section 502(a)(5) provides that a civil action may be brought "by the Secretary (A) to enjoin any act or practice which violates any provision of [ERISA], or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of [ERISA]."  29 U.S.C. § 1132(a)(5).  The permanent injunction removing Brain as a trustee and preventing him from serving as a fiduciary does not fall under section 502(a)(5)(A), as it is not an injunction prohibiting Brain from retaliating in violation of section 510.

The remaining option is for the permanent injunction to be permissible under section 502(a)(5)(B), which allows "appropriate equitable relief" either "to redress [the] violation" or "to enforce any provision of [ERISA]."  *Id.* Under this provision, the Secretary "must prove both (1) that there is a remediable wrong, *i.e.*, that the plaintiff seeks relief to redress a violation of ERISA . . . ; and (2) that the relief

sought is 'appropriate equitable relief.'" *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 954 (9th Cir. 2014) (citation omitted) (quoting 29 U.S.C. § 1132(a)(3)(B)).[7] "A claim fails if the plaintiff cannot establish the second prong, that the remedy sought is 'appropriate equitable relief,' . . . , regardless of whether 'a remediable wrong has been alleged.'" *Id.* (quoting *Mertens*, 508 U.S. at 254). Similarly, a claim fails if the first prong—that there is a wrong remediable by the relief sought—is unmet. *See id.*

Here, the Secretary argues that the district court's permanent injunction falls within the relief contemplated by ERISA section 503(a)(5)(B). Without a doubt, injunctions are a type of traditional equitable relief appropriate under section 503(a)(5). *See Mertens*, 508 U.S. at 256. However, no aspect of the district court's injunction redresses or enforces a violation of ERISA section 510.

First, section 409 expressly authorizes removal of a trustee for a breach of fiduciary duty. In turn, section 502(a)(2) expressly references section 409, providing that the Secretary may bring a civil action to obtain "appropriate relief under section [409] of this title." 29 U.S.C. § 1132(a)(2). The fact that removal is codified in its own statutory section, in conjunction with the fact that section 502 references section 409 separately from the equitable relief available under section 502(a)(5), indicates that section 409 authorizes a form of relief distinct from that typically available under section 502(a)(5). Put differently,

---

[7] In *Gabriel*, we discussed ERISA section 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B), which shares language nearly identical to ERISA section 502(a)(5)(B), 29 U.S.C. § 1132(a)(5)(B). The former provides for enforcement by a private plaintiff; the latter provides for enforcement by the Secretary.

if section 502(a)(5) independently allowed for removal of a trustee, even in the absence of a proven breach of fiduciary duty, there would be no need for sections 409 or 502(a)(2).

Next, the Secretary has cited no authority bringing removal of a trustee within the realm of "appropriate equitable relief" designed to "redress [a] violation" of section 510 or to "enforce" section 510. We have observed, for example, that appropriate equitable relief for an employee who has suffered retaliatory discharge may take the form of reinstatement to her former position. *See Teutscher*, 835 F.3d at 946. In such a scenario, reinstatement is a form of redress clearly designed to make the discharged employee whole. In contrast, here, the Secretary has not shown how removing Brain from his trustee position redresses the retaliation that Robbins, who received a settlement payout and benefits, suffered.

For the same reason, it is not apparent how enjoining Brain from "applying for, or accepting any fiduciary position with any ERISA-covered plan," unless he first discloses the terms of the district court's judgment, redresses a violation of section 510. The Secretary presents no viable reasoning as to why Brain's retaliation against an individual employee, who has already been made whole, justifies enjoining Brain from serving in a fiduciary capacity with other ERISA plans.

Nor is it apparent how removing Brain as a trustee and permanently enjoining him from serving as a fiduciary for the Trust Funds or any other ERISA plan enforces ERISA section 510. The cases cited by the Secretary are easily distinguishable from this case for one crucial reason: They involved breaches of fiduciary duty in violation of section 404. *See, e.g.*, *Shaver*, 332 F.3d at 1203–04 (instructing district court to consider various equitable remedies, including removal, should defendants be found to have

breached their fiduciary duties by failing to keep records essential to the well-being of the plan); *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) (affirming permanent injunction against defendants who "repeatedly used their fiduciary control over the [employee stock ownership plan's] assets to profit from self dealing"); *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991) (affirming removal of fiduciaries who engaged in egregious self-dealing, using approximately $30 million of the plans' assets); *Donovan v. Mazzola*, 716 F.2d 1226, 1235 (9th Cir. 1983) ("Where there has been a breach of fiduciary duty, ERISA grants to the courts broad authority to fashion remedies for redressing the interests of participants and beneficiaries."). As we have explained, the Secretary has not proven that a breach of fiduciary duty occurred here. It is incongruous to order the removal of a trustee—equitable relief specially designed to remedy a breach of fiduciary duty—when there has been no breach of fiduciary duty.

Lastly, the Secretary fails to explain how enjoining the Cook Defendants from providing services to the Trust Funds constitutes "appropriate equitable relief," where the Secretary did not prove that the Cook Defendants aided in any breach of fiduciary duty. As with the injunction against Brain, the injunction against the Cook Defendants does not "redress" or otherwise "enforce" a violation of section 510. *See* 29 U.S.C. § 1132(a)(5).

We cannot conclude in the Secretary's favor without construing ERISA section 502 in an impermissibly broad manner. *See Gabriel*, 773 F.3d at 953–54. The Supreme Court has cautioned that ERISA section 502 "does not . . . authorize 'appropriate equitable relief' *at large*, but only 'appropriate equitable relief' for the purpose of 'redress[ing any] violations or . . . enforc[ing] any provisions' of

ERISA." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000) (alterations in original) (quoting *Peacock v. Thomas*, 516 U.S. 349, 353 (1996)). Because the Secretary has not shown how the district court's permanent injunction redresses a violation of section 510 or otherwise enforces section 510, section 502(a)(5) does not supply an alternative basis to uphold any aspect of the injunction.**[8]**

## V. The District Court Did Not Err in Determining that the Cook Defendants Were Not Immune Under the Attorney Immunity Doctrine.

The Cook Defendants argue that they are immune from liability pursuant to the attorney immunity doctrine. Their arguments are meritless.

First, the plain text of the ERISA statute makes it unlawful for "any person" to retaliate in violation of section 510. 29 U.S.C. § 1140; *see Tingey v. Pixley-Richards W., Inc.*, 953 F.2d 1124, 1132 n.4 (9th Cir. 1992) (observing that because section 510 refers to "any person," not just an employer, "an insurer who coerces an employer to fire an employee must be covered by this language"). Second, none of the cases the Cook Defendants rely upon involve

---

**[8]** In contrast, the district court properly ordered the Cook Defendants to disgorge $61,480.62 they received in connection with their section 510 violation. ERISA permits equitable relief against nonfiduciaries in the form of restitution or disgorgement. *See Gabriel*, 773 F.3d at 957; *Concha v. London*, 62 F.3d 1493, 1504 (9th Cir. 1995) (holding plaintiffs "are entitled to pursue their claim for restitution . . . against all defendants, including [nonfiduciaries]"); *see also Mertens*, 508 U.S. at 262 (assuming nonfiduciaries can be sued under section 502(a)(3), nonfiduciaries "may be . . . compelled to make restitution"). Unlike the remedy of removal, disgorgement is a form of equitable relief within the scope of section 502(a)(5).

violations of section 510.  Most of them involve state-law causes of action, such as professional negligence.  *See, e.g.*, *Goodman v. Kennedy*, 556 P.2d 737, 742–44 (Cal. 1976) (concluding that attorneys did not owe a duty of care to non-client plaintiffs); *Skarbrevik v. Cohen, England & Whitfield*, 282 Cal. Rptr. 627, 636–37 (Ct. App. 1991) (concluding that an attorney could not be sued for professional negligence by a third-party to whom the attorney owed no duty of care); *Whitehead v. Rainey, Ross, Rice & Binns*, 997 P.2d 177, 181 (Okla. Civ. App. 1999) (holding that attorneys providing "proper and legal" advice to clients, although such advice "might potentially harm some third party," were not liable to non-client plaintiffs under a common-law professional negligence claim).  The Secretary did not sue the Cook Defendants under a common-law cause of action, but rather under a statute that authorizes "any person" to be liable.

The Cook Defendants' remaining citations to federal cases are wholly inapposite because they involve other statutory causes of action.  *See, e.g.*, *Heffernan v. Hunter*, 189 F.3d 405, 407 (3d Cir. 1999) (rejecting conspiracy claim brought under 42 U.S.C. § 1985, which sought to hold an attorney and client liable for conspiring to intimidate a plaintiff from serving as a witness in federal court); *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 111 (7th Cir. 1990) (another § 1985 conspiracy claim).  Here, the Secretary did not pursue a § 1985 conspiracy claim against Brain and the Cook Defendants, but rather sought to hold them individually liable under ERISA section 510.

## VI.    The Cook Defendants' Remaining Arguments Are Meritless.

Finally, the Cook Defendants assert a litany of challenges to the district court's findings of fact, attempting to relitigate this case on appeal.  We reject their invitation to

reweigh the evidence or second-guess the district court's careful credibility determinations, which warrant significant deference on appeal. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *Husain*, 316 F.3d at 840. The Cook Defendants have not shown that the district court committed any errors in its findings of fact, much less clear error. Without recapitulating the district court's thorough and amply supported findings of fact, we briefly list and reject the Cook Defendants' challenges to the district court's findings.

The district court did not err in finding that Cook's actions extended well beyond providing legal advices or that her "actions and advice as counsel were both substantially affected by her relationship with Brain." Nor did the district court err in finding that the November 18, 2011 Joint Board meeting was called in response to the DOL investigation, and that Cook played a key role in bringing about the meeting for retaliatory purposes.

The district court did not err in finding Robbins credible at trial—the district court thoughtfully excised from its consideration portions of Robbins's testimony that it deemed incredible, but properly considered the remainder of Robbins's testimony. The district court also did not err in concluding that Robbins had a good-faith belief that Brain was engaged in conduct that violated ERISA or in finding that the audit procedures Cook drafted were "designed with the expectation that the results of the audit would be unfavorable to Robbins." Furthermore, the district court did not err in finding that the Cook Defendants caused the A&C Department's work to be outsourced to Zenith, that the non-retaliatory reasons offered by Brain and the Cook Defendants in support of the outsourcing decision were pretextual, and that Cook caused Zenith not to hire Robbins.

Finally, the district court did not err in concluding that Cook retaliated against Rice.

## CONCLUSION

For the foregoing reasons, we affirm the district court with respect to the ERISA section 510 claim, as described herein, but reverse with respect to the ERISA section 404 claim, and vacate the district court's entry of a permanent injunction against Brain and the Cook Defendants.

The parties shall bear their own costs on appeal.

AFFIRMED IN PART, VACATED AND REVERSED IN PART.

---

SCHROEDER, Circuit Judge, dissenting in part:

The district court conducted a five-day bench trial. In comprehensive findings of fact and conclusions of law, the district court ruled that Scott Brain violated ERISA by retaliating against the whistleblower, Robbins, who had reported Brain's interference with Fund contributions. I agree with the majority's affirmance of this ruling. Yet the majority inexplicably then concludes that the retaliatory act, placing Robbins on administrative leave, was not a breach of Brain's fiduciary duty, and the majority vacates the court's injunction against Brain's returning to work for the Funds. As to this, I cannot agree.

The majority reaches its anomalous result by asking, and then answering incorrectly, a question that no one in this case heretofore has thought necessary to ask: whether Brain

was acting as an employer or a fiduciary. In my view, and the district court's view, he was clearly acting as a fiduciary.

There is not the slightest indication in this record that the decision to place Robbins on administrative leave was for any reason other than to cover up Brain's misconduct in cheating the Funds. Nor can there be any legal question that such misconduct was a breach of Brain's fiduciary duty to administer the Funds in the exclusive interest of the beneficiaries and participants. *See* 29 U.S.C. § 1104(a)(1)(B); *see also* Rest. 3d. Trusts § 78(1) ("a trustee has a duty to administer the trust solely in the interest of the beneficiaries . . . ."). The district court correctly found that the defendants could not articulate any "legitimate, nondiscriminatory reason for placing Robbins on leave."

There are, of course, cases in which what were primarily business decisions were challenged because of collateral effects on a fund. *See, e.g.*, *Husvar v. Rapoport*, 430 F.3d 777, 782 (6th Cir. 2005) (noting plaintiffs never "allege that the defendants themselves mismanaged any fund . . . . the complaint is replete only with allegations that the individual defendants mismanaged the company"); *Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992) (no fiduciary breach where employers merely "engaged in unwise business transactions") (quotation marks omitted); *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 88 (2d Cir. 2001); *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1499 (3d Cir. 1994); *Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1080 (4th Cir. 1989) (a business decision's incidental effect on the trust funds does not trigger ERISA protections). These are cases that the majority cites. Yet there is no law to support characterizing a fiduciary's efforts to cover up trust fund mismanagement as business, rather than fiduciary decisions.

Unlike traditional business and personnel decisions that only tangentially affect ERISA plan management, dismissing Robbins was inextricably intertwined with the "control over plan management or Administration." *See Lockheed Corp. v. Spink*, 15 U.S. 882, 890 (1996) (citation and quotations omitted). The meeting during which the vote to expel Robbins occurred was a meeting of trustees discussing their obligations as trustees. Robbins blew the whistle on Brain's Fund mismanagement – Brain's decision to oust her was a calculated move to insulate the Fund mismanagement from further scrutiny. The majority's conclusion that Brain wore only his "employer" hat is therefore untenable.

The majority's approach conflicts with ERISA's goal to safeguard trust funds, and the Supreme Court's implementing directive to construe broadly the fiduciary duties incumbent in administering an ERISA trust. *See Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996) (fiduciary duties extend to all activities that are "ordinary and natural means of achieving the objective of the plan.") (citation and internal quotation marks omitted); *see also Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1071 (9th Cir. 2005) (narrow interpretations of these fiduciary duties "conflict with ERISA's purpose"); *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1468 (9th Cir. 1995) (Ninth Circuit's policy is to "interpret[] the fiduciary duty broadly"); *Martori Bros. Distrib. v. James-Massengale*, 781 F.2d 1349, 1359 (9th Cir.) (ERISA's primary goal is preventing fund mismanagement), *amended*, 791 F.2d 799 (9th Cir. 1986).

The district court correctly concluded that Brain violated his fiduciary duty when he retaliated against Robbins for blowing the whistle on his Fund mismanagement, and Brain

should not be allowed to do so again.  I respectfully dissent from the majority's contrary decision.